**FIRST NATIONAL BANK OF HOME-STEAD, Plaintiff,**

v.

**Justin T. WATSON, Acting Comptroller of the Currency, Defendant,**

and

**The Second National Bank of Home-stead, Defendant-Intervenor.**

**Civ. A. No. 348–73.**

United States District Court, District of Columbia.

June 15, 1973.

**468**

Robert Schwind, Haas, Holland, Levison & Gibert, Atlanta, Ga., John P. Proctor, Debevoise & Lieberman, Washington, D. C., for plaintiff.

Jeffrey S. Rosen, Civil Div., Dept. of Justice, Washington, D. C., John E. Shockey and Edward Jiran, Office of the Comptroller of the Currency, Washington, D. C., for defendant Acting Comptroller.

William J. Dunaj, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., Sylvan Marshall, Marshall & Soll, Washington, D. C., for defendant-intervenor.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This is a civil action brought by the First National Bank of Homestead, individually, and by the Bank on behalf of its directors, officers and shareholders as citizens of south Dade County, Florida, concerned with protecting the quality of the environment in and around Homestead, Florida. Plaintiff Bank, at the moment the only banking association in Homestead chartered by the Comptroller of the Currency under the laws of the United States, seeks to enjoin the Comptroller from finally approving an application to organize a second national bank in Homestead, the Second National Bank of Homestead and the defendant-intervenor to this action. Plaintiffs seek injunctive relief on the theory that the Comptroller in issuing his preliminary approval failed to comply with procedures intended by the National Environmental Policy Act (NEPA) to be incorporated into the decision-making process of any federal agency whose actions may affect the quality of the human environment. *See* 42 U.S.C. § 4332.

Plaintiffs also contend that the Comptroller's decision is illegal since it is not supported by findings of fact and conclusions of law. Absent a showing that his action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the Comptroller is under no such obligation to explain his action. Pitts v. Camp, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). This opinion, therefore, is concerned only with the plaintiffs' claim under NEPA.

The defendants argue first that this court has no jurisdiction to review the Comptroller's action. They contend that since the Comptroller conditioned his approval on acquisition of the new bank by a registered bank holding company—American Bancshares, Inc.—proper review is in the United States Courts of Appeals pursuant to the Bank Holding Company Act of 1956, 12 U.S.C. § 1848. The defendants further argue that NEPA did not apply to the action of the Comptroller in this case and even if it did so apply, the Comptroller's office took into account the considerations mandated by NEPA and, in fact, prepared a report, forwarded to the plaintiffs at the time of the preliminary approval, which concluded that the proposed action did not constitute "major" federal action that would have any "significant" impact on the environment.

The matter is before the court on the plaintiffs' motion for a preliminary injunction and on the renewed motion to dismiss filed by the Comptroller and a motion to dismiss filed by the defendant-intervenor Bank. The court, having previously heard arguments on the government's first motion to dismiss, denied that motion by Order dated May 21,

1973 and enjoined the Comptroller from issuing a final charter pending decision on the plaintiffs' motion for preliminary injunction.

The court has heard arguments and has considered all the memoranda submitted in support of and in opposition to the motions pending before it, and makes the following findings.

Plaintiffs are primarily residents of Dade County and allege that a serious ecological crisis brought on by increased urbanization imminently threatens southern Dade County; they further claim any action which will induce increased urbanization, such as the lending activities of a bank, will adversely affected the environment on which both their personal lives and the continued viability of the bank itself depend.[1]

On June 7, 1972, an application was filed with the Comptroller for permission to organize the Second National Bank of Homestead as a subsidiary of American Bancshares, Inc.[2] The defendant Comptroller conducted a public hearing on the application on October 18, 1972, at which time the plaintiffs first urged that a new national bank would finance developments that in turn would contribute to the urbanization of the area and thus to the worsening eco-logical crisis.[3] Consequently, plaintiffs urged the Comptroller to consider the application within the context and criteria of NEPA.[4] By letter dated February 12, 1973, the Comptroller informed the plaintiffs that he had tentatively approved the application. But, because the new bank was to be a subsidiary of a bank holding company, the Comptroller conditioned the issuance of the charter on the Federal Reserve Board's approval of American Bancshares' acquisition of the new bank.[5] An application was filed with the Federal Reserve Board by American Bancshares on March 14, 1973, approximately three weeks after plaintiffs filed this action. The Board subsequently allowed the acquisition. Plaintiffs did not challenge the application in the administrative proceeding before the Board nor did they appeal the Board's decision.

At the conclusion of the administrative hearing on the application before the Regional Office of the Comptroller, Thomas G. DeShazo, Deputy Comptroller of the Currency, reviewed the evidence presented by the plaintiff and defendant banks and prepared a written five-page analysis which concluded that an environmental impact study was not required under the facts of this case. The

---

1. Based on these allegations, therefore, the plaintiffs have standing to bring this action. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed. 636 (1972).

2. Plaintiffs estimate that the total resources of American Bancshares, Inc. is approximately 200 million dollars. The proposed Second National Bank of Homestead is to be capitalized with one million dollars.

3. Plaintiffs have supplied the Comptroller as well as this court with voluminous material attesting to the water crisis in south Dade County. Plaintiffs' materials also include descriptions and copies of committee reports on state laws designed to protect against further pollution and to provide for long-range growth in the area. There is no information in the materials submitted, however, which shows the debilitating effects of banks on area ecology or which in any way connects environmental pollution to the activities of banks. Specifically, there is no showing that the making of loans by the proposed bank would affect in any way the continuing development of south Dade County.

4. There is some indication in the record that plaintiffs would not object to the establishment of an independent bank unsupported by the resources of a bank holding company and presumably with fewer assets. Plaintiffs' position on this is unclear, but for the reasons stated below, the court believes that this contention, even if supported by the administrative record, is immaterial to the resolution of this case.

5. Pursuant to the Bank Holding Company Act of 1956, as amended, a bank holding company must apply to the Federal Reserve Board for prior approval to acquire more than 5% of the voting shares of the new bank. 12 U.S.C. § 1842(a)(3).

memorandum is based on Mr. DeShazo's review of the administrative record. It is an analysis of the proposed new bank as it relates to the size of the community, the bank's proposed physical location and its traffic generating potential. It further includes a discussion of the pattern of growth in the area,[6] proposed highway construction, the pattern of growth in Homestead, the number of existing banks in Homestead and their rates of expansion, the availability of housing and land to accommodate increasing needs, and the economic effects of the proposed bank's operations on the area. The memorandum concludes, *inter alia*, that the establishment of the proposed bank will have no effect on the rate of growth in the area.

A copy of this document was forwarded to the plaintiffs on February 12, 1973, pursuant to their request during the hearings, along with the Comptroller's notification of the preliminary approval of the new charter. On February 22, 1973, plaintiffs brought this action.

Additional evidence demonstrates that a national bank charter is a Federal license to engage in the business of banking, 12 U.S.C. § 27, and that it is granted only after: (a) the filing of a detailed application supported by an economic summary of information and financial and biographical information on the organizers; (b) a thorough investigation by the bank examiners employed by the defendant Comptroller; (c) a complete review by the Regional Administrator of National Banks and his staff; (d) in many cases, further consideration of the issues raised by the application in a public hearing held by the Regional Administrator; and (e) further review by the Washington staff of the defendant before presentation to the defendant Comptroller of the Currency for approval or disapproval.

In addition, national banks created by the United States are regarded by Congress as an important and integral part of a Congressional plan to provide the nation with a safe and sound banking system, to effectuate important government financial purposes and as an important means of implementing the nation's monetary policy through the mandatory membership of all national banks in the Federal Reserve System.

The evidence further demonstrates that the proposed location for the new bank is on commercially-zoned property at a busy intersection in Homestead, near several shopping centers and within the immediate area of three existing banks and two savings and loan branch offices. Of the three existing commercial banks, the Barnett Bank of Homestead is a subsidiary of the second largest bank holding company in the State of Florida with total assets exceeding $1.4 billion and total deposits of approximately 1.2 billion dollars. Dade County presently has over 75 commercial banks, 15 savings and loan associations with over 72 offices and almost 200 mortgage lending agencies. In addition, insurance companies and national bank real estate investment trusts are active in the area. It appears from Mr. DeShazo's analysis as well as from affidavits submitted by the intervenor Bank that a substantial portion of the funds being utilized in the Homestead area come from lending institutions not located in the area. Most construction lending is presently being done by insurance and mortgage companies located in Miami.[7] In view

6. The City of Miami is a rapidly growing metropolis whose northern and eastern surrounding areas are substantially developed with expansion now directed into south Dade County.

7. Mr. DeShazo's memorandum recognizes that "the suburban development of south Dade County will continue irrespective of whether the Comptroller approves or disapproves the subject application". Memorandum at p. 3. In further support of this conclusion by Mr. DeShazo, defendant-intervenor Bank submits to the court the affidavits of Professor Edward J. Fox, Professor of Marketing at the University of Miami, whose expertise is not challenged and who notes that only 12.5% of the mortgage loans in excess of $100,-000 made in the primary service area of

of the Comptroller's detailed application procedure, *supra*, and Mr. DeShazo's conclusions relating to the effect of the proposed new bank on the area, the court can only conclude that all these factors were properly taken into account in the Comptroller's decision.

Finally, from the material submitted by all parties, the court recognizes the vigorous efforts of the State of Florida, Dade County, and local private and public agencies to marshall their resources and organize a plan to protect the area from further ecological degradation. The court also notes that appropriate state agencies have the authority to impose a moratorium on all building and development in the area which may be harmful to the environment.[8]

## JURISDICTION

The defendants vigorously argue that proper jurisdiction for this review lies in the United States Courts of Appeals since the acquisition of the new bank by a registered bank holding company had to be approved by the Federal Reserve Board before the Comptroller could issue his approval. The defendants contend, therefore, the case of Whitney National Bank v. Bank of New Orleans and Trust Co., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed. 2d 386 (1965), controls here and plaintiffs must raise their objections before the Federal Reserve Board and, thereafter, before the appropriate Court of Appeals. This court disagrees.

■ It is well settled that the actions of the Comptroller of the Currency are subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701. See Pitts v. Camp, 411 U.S. 138, 140, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973). Jurisdiction therefore certainly lies in this court to review his actions. 28 U.S.C. §§ 1331, 2201–02. See Pitts v. Camp, *supra*; Wood County Bank v. Camp, 348 F.Supp. 1321 (D.D.C.1972), reversed on other grounds, (No. 72–1944, 72–2016, May 7, 1973).

In *Whitney*, plaintiff banks were concerned with the acquisition of a new national bank in an adjoining county by a holding company whose reorganization was being used as a device to circumvent Louisiana's ban on branch banking outside of a bank's home-office county. Plaintiffs there were not concerned with the Comptroller's creation of the new national bank, but rather with the bank's acquisition by the newly-created holding company for the purpose of avoiding the branch banking ban. However, plaintiffs chose to challenge the holding company's acquisition by an attack on the Comptroller in the federal district court. The Supreme Court found that the plaintiffs were in reality attempting to challenge the Board's decision, 379 U.S. at 418–419, 85 S.Ct. 551, and held that plaintiff banks' complaint tendered issues cognizable only by the Board and, therefore, reviewable only by the appropriate Court of Appeals.[9]

■ Furthermore, *Whitney* is pre-NEPA. NEPA creates new duties for both the Federal Reserve Board and the Comptroller.[10] Indeed, counsel for the defendants readily conceded in oral argument that the Comptroller's actions

---

the proposed new bank within the last three years were made by the only two banks located in this primary service area during this time. The affidavit of Alfred W. Slobusky, President of American Bancshares, Inc. notes that construction loans made by his company's member banks located in Dade County as of May 25, 1973 accounted for less than 3½% of the total assets of those banks.

8. Code of Metropolitan Dade County, §§ 22–54, –55, 33–319, –20, 33–279, ch. 8, 9, 15, 17, 24, 32, 33; Florida Stat. ch. 403, F.S.A.

9. 379 U.S. at 419, 85 S.Ct. 551. See 12 U.S.C. § 1848.

10. NEPA by its own terms applies to all federal agencies. §§ 101(b), 102(2) of the Act. See Billings v. Camp, 2 E.L.R. 20687 (D.D.C. Oct. 4, 1972); Calvert Cliffs Coordinating Committee, Inc. v. USAEC, 146 U.S.App.D.C. 33, 449 F. 2d 1109, 1112 (1971); City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972); S.C.R.A.P. v. United States, 346 F.Supp. 189 (D.D.C.1972); Citizens For Reid State Park v. Laird, 336 F.Supp. 783 (D.Maine 1972).

are not immune from NEPA. Plaintiffs here complain that the Comptroller failed to comply with his duties under NEPA. They, therefore, raise questions properly before this court.[11] Billings v. Camp, 2 E.L.R. 20687 (D.D.C. Oct. 4, 1972); S. C. R. A. P. v. United States, 346 F.Supp. 189, 197 (D.D.C.1972).

## APPLICABILITY OF NEPA

■ Having found proper jurisdiction in this matter, the court will now consider the core question raised by plaintiffs' complaint; that is, whether the Comptroller's action in preliminarily approving the charter for the proposed new bank violated the mandates of NEPA. It must first be pointed out that NEPA applies to *all* federal agencies, including the Comptroller of the Currency.[12] The Act requires the Comptroller to take certain preliminary steps before making any decision which may affect the environment. These steps are clearly outlined in Section 102(2) of the Act.

■ Plaintiffs in their complaint argue that the Comptroller is required to prepare a detailed environmental impact statement pursuant to 102(2)(C) of the Act since the Comptroller's decision is a "major" federal action which "significantly" affects the environment. This court cannot make a *de novo* determination on these questions. Rather, "the responsible federal agency has the

authority to make its own threshold determination as to each in deciding whether an impact statement is necessary." Hanly v. Mitchell, 460 F.2d 640, 644 (2d Cir. 1972) (hereinafter Hanly I).[13] Although the court does not agree with the defendant Comptroller's argument that this action is not a "major" federal action[14] it cannot quarrel with his conclusion that granting this charter will not "significantly" impact the environment around south Dade County.

Plaintiffs leave to pure speculation resolution of the question whether chartering this bank will accelerate the rate of pollution in the area. They provide no data on an individual bank's effect on industrial development in an area, let alone on its affect on the environment. Plaintiffs would have this court and the Comptroller speculate that the bank possibly will make development loans in the area which might harm the environment. Furthermore, the existence of strong local and state laws protecting the environment[15] and the rising consciousness on environmental matters in south Dade County suggest that existing factors would intervene to prevent the bank from financing a project which might cause ecological harm to the area.

■ Certainly, the burden is on the agency to prove there will be no environmental impact as a result of its actions under 102(2)(C). S.C.R.A.P. v. United States, *supra*. But the facts of this case

---

11. Plaintiffs rely on the actions of the Federal Reserve Board only to the extent that the Board's actions will aggravate the harm to the environment initiated by the Comptroller by allowing the bank to become associated with added sources of capital. However, the defendant Comptroller alone can create a new national bank. The fact that he may in his sole discretion place conditions on his approval of the charter application precedent to the final issuance of a certificate to commence business is a matter of administrative expediency and not a requirement of law. The Bank Holding Company Act does not prevent the Comptroller from creating the new bank in the first instance; it only prevents a holding company from acquiring the bank once it

has been created. All the Bank Holding Company Act provides is that:

"It shall be unlawful, except with the prior approval of the Board, . . . (3) for any bank holding company to acquire direct or indirect ownership control of any voting shares of any bank . . . " 12 U.S.C. § 1842(a).

12. See note 10, *supra* and accompanying text.

13. The standard of review for an agency decision under NEPA seems unsettled, however; see Scientists Institute for Public Information, Inc. v. AEC, 156 U.S. App.D.C. 395, 311, 481 F.2d 1079, 1095 (1973).

14. See Bilings v. Camp note 10, *supra*.

15. See note 8, *supra*.

indicate only that the federal action will *possibly* allow others to set into motion projects which *possibly* will affect the local environment. In considering the effect of its actions for purposes of § 102(2)(C), it would seem that an agency is not required to let its imagination run wild as to whether there will be *any* environmental impact. "NEPA requires predictions, but not prophecy" in order to draft a meaningful impact statement under 102(2)(C). Scientists Institute for Public Information, Inc. v. AEC, 156 U.S.App.D.C. 395, 405, 481 F.2d 1079, 1089. The court has been unable to find any authority which would impose such an obligation on the agency.[16] This case is unlike other 102(2)(C) cases in which the federal action directly triggered forces which had a certain impact. See Davis v. Morton, 469 F.2d 593 (10th Cir. 1972); Silva v. Romney, 342 F.Supp. 783 (D.Mass.1972); City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972); S.C.R.A.P. v. United States, *supra.* Thus, "whatever the theoretical environmental impact of [the proposed federal action] may be, in this case the actual impact appears to be minimal and adequately accounted for in the [government] memorandum." Hanly v. Mitchell, *supra*, 460 F.2d at 646.

The Comptroller had no evidence before him of any actual environmental impact; he could just as easily speculate that the bank would finance developments that would be beneficial to the environment. Indeed, a cursory review of the Florida environmental and statutory material brought to the court's attention indicates a need for banking facilities to carry out the local purpose of these statutes. Furthermore, as noted above, the great bulk of the development capital used in the area comes from outside sources, a factor which further dilutes the likelihood that the bank will have any significant effect. The court finds no reason to upset the Comptroller's conclusion that urbanization will continue to expand southward in Dade County at its present rate irrespective of the creation of another national bank in its path.

Plaintiffs also argue, however, that the Comptroller's five-page memorandum was not prepared in accordance with § 102(2)(A), (B) and (D) of NEPA. That is, it does not disclose the "systematic, inter-disciplinary approach",[17] the "methods and procedures"[18] to "insure that presently unquantified environmental amenities may be given appropriate consideration in decision making along with economic and technical considerations",[19] or a description of "alternatives to recommended courses of action in any proposal".[20] In short, plaintiffs conclude that the five-page memorandum is not a reviewable "environmental record".[21] Consequently, they argue the Comptroller's order must be vacated and the cause must be remanded to the Comptroller for considerations consistent with the requirements of NEPA.

16. On June 12, 1973, the United States Court of Appeals for this circuit held that Atomic Energy Commission's proposed Liquid Metal Fast Breeder Reactor program requires the agency to prepare a a 102(2)(C) impact statement about the program. The program contemplates widespread, nationwide deployment of nuclear reactors. However, as yet there has been no specific deployment of commercially feasible reactors. Although the precise impact of this proposed network of reactors is thereby subject to some speculation, there is no question that development of the AEC's program will have an effect, indeed, a controversial effect, on the environment. Further, some deployment seems almost a certainty. Congressional funding of the program increased from $90.3 million in fiscal 1971 to $130 million in fiscal 1972, and future federal expenditures are expected to be over $2 billion. Slip op. at 7. In fact, statutory authorization has been obtained to proceed with the first demonstration plant. Slip op. at 6. The program seems to have full support of both the Executive and Legislative branches of the government.

17. Section 102(2)(A).

18. Section 102(2)(B).

19. *Id.*

20. Section 102(2)(D).

21. *Hanly I.*

■ First, NEPA does not dictate the precise form of the record which must be made at the agency level. Hanly v. Kleindienst, 471 F.2d 823, 835 (2d Cir. 1972) (Hanly II). Its thrust is to force each agency to consider the effect of its actions as these actions relate to the environment. Consequently, it imposes on each agency the duty to set up procedures which will assure a fair and informed preliminary decision. Id. at 834–836. In the Hanly I and II cases, the court concluded that a single-page memorandum was sufficient to support the General Service Administration's determination that a proposed office building would have no adverse affects on the environment. The court found that the memorandum, although admittedly "terse", adequately accounted for all relevant environmental factors, 460 F.2d at 646–647; it reached this conclusion despite an apparent intention in the second Hanly decision to establish a more formal preliminary procedure. See 471 F. 2d at 837 (Friendly, C. J., dissenting).

■ Nevertheless, the court here must squarely face the fact apparent from the record that the Comptroller has not utilized the formal procedural mechanism contemplated by NEPA in making his decision. Notwithstanding his failure to do so, however, the five-page memorandum shows that the Comptroller has considered all relevant environmental factors and has reached a fair and informed preliminary decision under NEPA.[22] Consequently, NEPA does not compel the court to vacate the Comptroller's order.

In City of New York v. United States, supra, Judge Friendly confronted a similar problem in deciding whether to vacate an Interstate Commerce Commission order authorizing abandonment of a small railroad line. There, however, the Commission totally failed to consider environmental factors [23] in a proceeding which it conceded raised "a substantial question of possible damage to the environment", 337 F.Supp. at 159, n. 11. After noting that "we are not eager to remand for what may well be a largely ritualistic act," id. at 159, the court did remand the application to the Interstate Commerce Commission concluding that "such considerations do not justify the Commission's disregard of the law," id. at 160. The court, however, refused to vacate the Commission's order:

> "[s]uch action is not compelled. In reviewing the Commission's action, we sit as a court with equity powers, and as such 'may adjust relief to the exigencies of the case in accordance with the equitable principles governing judicial action. The purpose of judicial review is consonant with that of the administrative proceeding itself,—to secure a just result with a minimum of technical requirements.'"

Id. at 163. See also Hanly II, 471 F.2d at 836. As in City of New York, the special circumstances here justify this court's refusal to vacate the Comptroller's preliminary decision. The Comptroller has taken all relevant factors into account as intended by NEPA, and it appears that his initial decision will not ultimately be affected should the order

---

22. A close reading of the memorandum on which his decision is based indicates actual, if not formal, compliance with §§ 102(2)(A) and (D). With respect to subsection (A), it has already been demonstrated that Mr. DeShazo considered the operation of the bank in relation to the entire complex of community life in and around Homestead. Although his analysis does not include an express reference to the Comptroller's alternatives, it is obvious it is based on balancing the need in the community for a second national bank against the bank's effec⁺

on the local environment. This leaves only subsection (B) considerations unresolved. But his failure to comply with subsection (B) does not require this court to suspend the Comptroller's action while awaiting such compliance. Cf. Environmental Defense Fund v. Corps of Engineers of the U.S. Army, 325 F.Supp. 749, 758 (E.D.Ark.1971).

23. The question of the applicability of NEPA was raised for the first time by plaintiffs on appeal of the Commission's order.

be vacated and he forced to reconsider ab initio.

## CONCLUSION

Finally, the court must decide whether remand to the Comptroller for further review of the application consistent with the procedural requirements of NEPA is warranted.[24] For the reasons set out above in this opinion, the court believes that the Comptroller's failure to comply with the technical requirements of the Act in this case does not justify further suspension of his order.[25] In so deciding, the court finds itself in the position of adding to a trend which protests its concern for NEPA, and yet finds that NEPA's technical provisions have been violated,[26] and overlooks these violations in favor of the final agency decision. However, in reaching a conclusion on remand, this court must balance the public interest against the demonstrated environmental costs of the Comptroller's action. Cf. Calvert Cliffs Coordinating Committee v. USAEC, 146 U.S.App.D.C. at 47, 449 F.2d at 1123. The court, therefore, finds that the Comptroller's decision to create the Second National Bank of Homestead should not be upset.

For the foregoing reasons, the court will deny the motion for preliminary injunction by plaintiffs and dismiss the complaint. Fed.R.Civ.P. 12(b)(6). The court does not find it necessary to expressly rule on the cross motions to dismiss by the defendant Comptroller and the defendant-intervenor Bank.

---

24. In City of New York, Judge Friendly sent the railroad's application for abandonment back to the Interstate Commerce Commission for reconsideration. At the same time, however, the Interstate Commerce Commission's final order remained in effect. This court does not find it necessary to remand and, therefore, need not consider the question of whether the Comptroller's statutory authority or regulations allow him to continue his review of an application for a bank charter while the bank itself is allowed to commence operations.

25. It might be argued that this decision may work to subvert the integrity and purpose of NEPA. See Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Comm., 146 U.S. App.D.C. 33, 449 F.2d 1109 (1971); City of New York v. United States, supra. However, preservation of the integrity of the Act requires that it be shielded from the abuse and misuse which would result if the Act is used in the circumstances of this case simply to delay the Comptroller's actions. Cf. Hanly II, supra, 471 F.2d at 837 (Friendly, C. J., dissenting).

26. See, e. g., Hanly I & II, supra; City of New York v. United States, supra.