**FIRST NATIONAL BANK OF FAYETTE-VILLE et al., Plaintiffs,**

v.

**James E. SMITH, Comptroller of the Currency of the United States, Defendant,**

**Northwest National Bank, Intervenor.**

**No. F-73-C-12.**

United States District Court, W. D. Arkansas, Fayetteville Division.

Nov. 1, 1973.

James F. Dickson of Crouch, Blair, Cypert & Waters, Springdale, Ark., F. H. Martin, Jr., of Ball, Gallman & Martin, Fayetteville, Ark., for plaintiffs.

Sam Hugh Park, Asst. U. S. Atty., Fort Smith, Ark., Harlington Wood, Jr., Asst. Atty. Gen., Harland F. Leathers and David C. Shonka, Attys., Dept. of Justice, Washington, D. C. (John E. Shockey and Edward Jiran, Attys., Office of Comptroller of the Currency, Washington, D. C., of counsel), for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge, Sitting by Designation.

On July 8, 1972, ten individuals, residents of the Fayetteville, Arkansas, area filed application with the Comptroller of the Currency for permission to organize a national bank in Fayetteville. The applicants filed financial, biographical and economic data in support of their application. A field investigation was conducted by a commissioned National Bank Examiner, and on November 21, 1972, the Comptroller's Regional Administrator held a hearing on the application in Memphis, Tennessee. The record developed by the investigation at the hearing was reviewed by the Examiner, the Regional Administrator and members of the Comptroller's staff. in Washington, D. C. On February 5, 1973, the Deputy Comptroller, Thomas G. DeShazo, advised the applicants that the Comptroller had granted preliminary approval of the application to organize the Northwest National Bank at Fayetteville.

On February 16, 1973, the plaintiffs, First National Bank of Fayetteville, Ark., and one other national bank, together with five banks chartered under the laws of the State of Arkansas and two Savings and Loan Associations chartered under the laws of the State of Arkansas, all residents of the State of Arkansas, and maintaining their principal place of business in Washington County, Arkansas, commenced this action against Thomas B. Camp, the then Comptroller of the Currency of the United States, seeking to enjoin the Comptroller from issuing a charter to the applicants. Soon thereafter Mr. Camp retired and Justin T. Watson became Acting Comptroller.

On March 22, 1973, plaintiffs filed a request for production of documents.

On April 19, 1973, the defendant filed response to the request of plaintiff for production of documents. On July 18, 1973, the plaintiffs filed a motion for an order for sanctions against defendant for failure to make discovery. In the motion it was alleged that in the response of defendant to the request for production of documents, the defendant agreed to file the entire administrative file of his office except for certain personal information filed by the organizers, which

the defendant asserted was privileged and not subject to discovery, and that the plaintiffs had constantly sought to obtain the administrative file but defendant had not at that time submitted and filed any portion of it. Upon the filing of that motion, the court on July 31, 1973, ordered the defendant to furnish to plaintiffs' counsel his administrative file accumulated on the matter herein under consideration, and reserved the question of whether sanctions should be imposed pending defendant's compliance with the order.

On August 28, 1973, the court set for hearing on September 14, 1973, application of plaintiffs for a preliminary injunction pending final determination of this cause, restraining the Comptroller from giving final approval and granting charter authorizing the applicants to operate a proposed facility.

On September 7, 1973, the plaintiffs filed a motion to compel defendant to fully comply with the request for production of documents as set forth in plaintiffs' motion of April 22.

On the date fixed for the hearing on the application for preliminary injunction, the defendant filed his motion for protective order with memorandum in support thereof based upon the affidavit of the Comptroller, in which he stated that the documents not heretofore submitted in the administrative file "may not be made a part of a public court record without significant injury to the Comptroller's office to conduct adequate investigations of national bank charter applications." He further stated that he did not include in the administrative file 52 documents with certain attachments "referring to information solicited and received in confidence from the applicants, commercial reporting services and other individuals with regard to the character, ability and financial affairs of the individual applicants and the proposed management of the applied-for national bank." Also omitted were ten individual memoranda or portions thereof prepared by national bank examiners concerning the character, ability and financial affairs of each of the applicants for the proposed new bank.

At the conclusion of the hearing on September 14, the court took under consideration the defendant's motion for protective order and the plaintiffs' application for preliminary injunction.

On October 4, 1973, the plaintiffs submitted their memorandum in opposition to the motion of defendant for protective order, and the court on that date entered an order directing the Comptroller to deliver in a sealed package to the Clerk of the Court the documents described in paragraphs 4(a) and (b) of the affidavit of the Comptroller attached to the motion to be inspected in camera by the court only.

On October 12, 1973, the court was advised that applicant would not request the Certificate of Authority from the Comptroller until this case had been disposed of on its merits. Thus, further consideration has not been given by the court to the motion of plaintiffs for a preliminary injunction.

The plaintiffs alleged in their complaint that they "are unable to obtain a meaningful judicial review without the Comptroller making and furnishing findings of fact, conclusions and rendering a well reasoned opinion justifying issuance of a charter on the application, and in the absence of such findings, conclusions and opinion the action of the Comptroller is void and unlawful, and further proceedings by him should be enjoined as any charter issued pursuant to his decisions would be void."

In paragraph 14 of the complaint the plaintiffs alleged:

"* * * that in the light of the economic data, exhibits and testimony presented to and gathered by Comptroller, that Comptroller acted arbitrarily and capriciously and abused his discretion in approving the issuance of a charter on the application on the basis of such economic data, exhibits and testimony. The proliferation of banking facilities in the Fayetteville area is highly questionable in

view of the previous state determination concerning need, convenience and other factors, and because of the unknown and unprovable impact of another banking facility on existing banks and financial institutions so that Comptroller's action is contrary to public interest."

The answer filed by Justin T. Watson while he was Acting Comptroller denied the principal allegations in the complaint, and alleged that the plaintiffs attended the hearing on the application to organize the Northwest National Bank and that they were permitted to submit comments and materials in opposition thereto, and prayed that the complaint of plaintiffs be dismissed.

In the defendant's motion for summary judgment filed September 14, 1973, the Comptroller alleges "that the record now before the court establishes the Comptroller's decision was reasonable and in accordance with the law, that there is no genuine issue of material fact and that defendant therefore is entitled to a judgment as a matter of law."

In support of the motion the Comptroller refers to (1) the complaint, (2) the answer of defendant, and (3) the certified administrative file on the application dated July 8, 1972.

On October 12, 1973, the plaintiffs filed a cross motion for summary judgment pursuant to Rule 56(b), Fed.R. Civ.P., upon the grounds "that the record now before the court establishes that there is no genuine issue of material fact and that the plaintiffs are entitled to judgment in their favor as a matter of law."

The plaintiffs, in opposing the motion for protective order, contended that the defendant had not made the entire administrative file available to them and that without such information they are effectively denied an opportunity to review a significant and relevant part of the record upon which the defendant's decision is based. They therefore contended that they are entitled to a trial

de novo to review the defendant's decision.

The defendant submitted the documents and material in accordance with the order of October 4, and the complete file that was before the Comptroller is now before the court, although not completed in the manner as suggested by the court in Camp v. Pitts (1973), 411 U.S.. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106. The court is of the opinion that the procedure followed in completing the administrative file is valid and cannot agree that plaintiffs are entitled to a de novo hearing. See, Peoples Bank of Trenton v. Saxon (6 Cir. 1967), 373 F. 2d 185; First National Bank of Crown Point v. Camp (N.D.Ind.1971), 342 F. Supp. 871; Bank of Dearborn v. Saxon (E.D.Mich.1965), 244 F.Supp. 394.

The court has examined the documents and material in strict accordance with the order of October 4. See, United States v. Certain Parcels of Land (S. D.Cal.1953), 15 F.R.D. 224, 233.

The action arises under Section 10 of the Administrative Procedure Act (5 U. S.C. §§ 701–706); Sections 21 through 27 of the National Bank Act (12 U.S.C. §§ 21–27); and Section 1 of the Declaratory Judgment Act (28 U.S.C. § 2201). The court's jurisdiction is founded on the existence of a federal question and the amount in controversy exceeds $10,000, exclusive of interest and costs. 28 U.S.C. 1331(a). Webster Groves Trust Co. v. Saxon (8 Cir. 1966), 370 F.2d 381; Olsen v. Camp (E.D.Mich. 1969), 328 F.Supp. 728. Under the facts venue is established by 28 U.S.C. § 1391.

No one contends that the defendant's action is not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Data Processing Service v. Camp (1970), 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Camp v. Pitts, supra.

In 1966 the Court of Appeals for the Eighth Circuit in Webster Groves Trust

Co. v. Saxon, supra, at page 384 of 370 F.2d said:

"We believe that competing banks, as interested parties, have a right to challenge illegal acts of the Comptroller and that the Comptroller's discretionary actions are not immunized from judicial review * * *."

Beginning on page 387, the court, in discussing the authority and limitations of the Comptroller, said:

"Therefore, if he acts in excess of his statutory grant of power, acts arbitrarily or capriciously, abuses his discretion, or unlawfully discriminates in violation of the Constitution, he is certainly subject to restraint by the courts. Though he may exercise the discretion the expertise of his office affords him, the congressional grant of authority does not empower arbitrary and capricious action, nor does it contemplate abuses of that discretion. Therefore, we do not believe the courts are powerless to protect the public from unconstitutional, illegal, or otherwise arbitrary activities of administrative officials. The Comptroller is free to exercise his discretion in the granting of charters, free from any review on the merits of his action. However, if the Comptroller acts in excess or abuse of his legal authority, to this extent his actions are subject to judicial review, with the burden of proof resting on the party seeking the review. This holding we believe to be consistent with § 10 of the Administrative Procedure Act, 5 U.S.C. § 1009, because no statute precludes judicial review, nor is this the type of agency action that is by law committed to agency discretion so as to be 'immunized from review by the exemption in the preface of § 1009'. First National Bank of Smithfield, North Carolina v. Saxon, supra, at page 270 of 352 F.2d [267, 4 Cir.]. Therefore, subsection 10(c) of the Act, 5 U.S.C. § 1009(c) would be applicable. This subsection reads:

" 'Acts reviewable.

" '(c) Every agency action made reviewable by statute and *every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review.*' (Emphasis added.)"

The above subsection has been incorporated in § 704 of 5 U.S.C.

■ The appropriate standard for review is whether the defendant's action and holding are arbitrary, capricious and an abuse of discretion or otherwise not in accordance with law.

Title 5 U.S.C. § 706 provides that the reviewing court shall:

"(1) compel agency action unlawfully withheld or unreasonably delayed; and

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \* \*

"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

■ The administrative file in its entirety must be considered. Camp v. Pitts, supra; Universal Camera Corp. v. National Labor Relations Board (1951), 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

■ The burden is upon the plaintiffs to show from the administrative file as a whole that the defendant acted arbitrarily, capriciously, abused his discretion, or otherwise failed to act in accordance with law.

Capricious is defined as lacking a standard or norm, marked by variation or irregularity, lacking a predictable pattern, erratic or whimsical. Webster's Third New International Dictionary. Arbitrary is said to mean not rational or not done or acting according to reason

or judgment. Black's Law Dictionary (Rev. 4th Ed.). The term taken together, "arbitrary and capricious," has been defined as an act done without adequate determining principle or not done according to reason or judgment. In 73 C.J.S. Public Administrative Bodies and Procedure, § 209, p. 569, the learned author states:

"Under the rules as to the scope of judicial review, 'arbitrary or capricious action' of administrative bodies means willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case, and under the provisions for judicial review of administrative action contained in the Federal Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., the question of 'reasonableness' depends on whether the order sought to be reviewed is a rational conclusion and not so unreasonable as to be capricious, arbitrary, or an abuse of discretion."

In Citizens to Preserve Overton Park, Inc. v. Volpe (1971), 401 U.S. 402, 91 S. Ct. 814, 28 L.Ed.2d 136, the Supreme Court had occasion to consider the statutory language involved herein, and at page 416 of 401 U.S., page 823 of 91 S. Ct. said:

"Section 706(2)(A) requires a finding that the actual choice made is not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' * * * To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. * * * Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

In 4 Davis Administrative Law, § 29.-03, p. 127, the author states:

"The only federal problem about review on the whole record is the curiously cluttered one of what was the law before enactment of the APA in 1946. It is hard to see how sensible judges could conceivably appraise the substantiality of evidence in a record without looking at the evidence on both sides, for evidence has significance only in a context, not in the abstract. As Professor Jaffe wrote as long ago as 1943: 'Obviously responsible men would not exercise their judgment on only that part of the evidence that looks in one direction; the rationality or substantiality of a conclusion can only be evaluated in the light of the whole fact situation or so much of it as appears. Evidence which may be logically substantial in isolation may be deprived of much of its character or its claim to credibility when considered with other evidence.' "

Briefs have been served and submitted by the parties in which their contentions and arguments in support thereof have been fully presented.

The intervenor, Northwest National Bank, in its brief adopted by reference certain portions of the Comptroller's supporting memorandum brief of his motion for summary judgment. It contends that the standard of review must be applied in relation to the administrative record as a whole, and that the facts need not substantially support the decision of the Comptroller but merely provide a rational support thereof. The intervenor then discussed the five investigative areas indicated in 12 C.F.R., § 4.2(b), discussed by plaintiffs in their brief. As to the third area of investigation relating to convenience and needs of the community to be served by the proposed bank, the intervenor contends that the answers to those questions are matters of judgment and the point is not whether the Examiner's or Regional Administrator's judgment is supported in the record for the reason that they are charged with the burden of making a decision thereon, and repeats that the sole issue on review is whether there is a rational basis in the record for the

Comptroller's decision. A similar contention is made with reference to the fourth and fifth areas of investigation.

All the briefs and arguments of the parties have been considered.

The administrative file discloses that the defendant took the following actions prior to making his decision upon the application.

A field investigation was made by a commissioned National Bank Examiner. A hearing was held by the defendant's Regional Administrator, at which protestants of the application and organizers were permitted to introduce evidence in support of their respective positions and contentions. The subordinates of the defendant were requested to and did make recommendations to the defendant. The National Bank Examiner who conducted the investigation, the Regional Administrator, who conducted the hearing and supervised the compiling of the administrative file, the Director of the Bank Organization Division, the Senior Economist of the Department of Economic Banking and Research, and a Deputy Comptroller of the Currency all submitted findings and recommendations on the application. Four of the above listed subordinates recommended that the application be disapproved. Only the Deputy Comptroller of the Currency recommended that the application be granted. The examiner, the Regional Administrator, the Director of the Bank Organization Division and the Economist briefly stated their reasons for disapproval. Thomas G. DeShazo, Deputy Comptroller, gave his reasons for approval.

▇▇▇ The Comptroller, Mr. Camp, gave no reasons whatsoever, merely signed his name as approving the application. He made no findings of fact nor is there any statement of reasons for his decision in the file. He is not required to file an opinion or enter in the file any findings of fact. Camp v. Pitts, supra; Sterling National Bank of Davie v. Camp (5 Cir. 1970), 431 F.2d 514; Webster Groves Trust Company v. Sax-on, supra. He merely adopted the statement of the Deputy Comptroller and must have accepted and relied upon the conclusions of the Deputy Comptroller (A.F. pp. 9–12) as requiring the approval of the application. Therefore, it is necessary to examine the entire file and compare the reasons given by the Deputy Comptroller with the facts as disclosed by the administrative file to determine whether there is a rational basis in the record for the Comptroller's decision. Citizens to Preserve Overton Park v. Volpe, supra.

Sec. 4.2(b) of 12 C.F.R., issued by the Comptroller, governing the action to be taken by his office upon receipt of an application for a national bank charter, provides:

"(b) Investigation. The Comptroller of the Currency may conduct such investigation as he deems necessary or proper, including the gathering of information as provided in Part 5 of this chapter. Matters investigated include:

"(1) The adequacy of the proposed banks capital structure.

"(2) The earning prospects of the proposed bank.

"(3) The convenience and needs of the community to be served by the proposed bank.

"(4) The character and general standing in the community of the applicants, prospective directors, proposed officers, and other employees, and other persons connected with the application or to be connected with the proposed bank.

"(5) The banking ability and experience of proposed officers and other employees."

A comparison of the facts reflected by the administrative record with the memorandum of the Deputy Comptroller will be made upon the factors appearing in the above regulation.

(1) In regard to the capital structure of the proposed new bank, the Deputy simply states that the proposed capital of $1,000,000 is considered adequate.

(A.F. p. 11). The Regional Administrator comments that this meets statutory requirements and is considered sufficient to support the type of lending operations contemplated as well as to offset initial operating costs until a break-even point is reached. (A.F. pp. 23, 61.) The record reflects that other banks and savings and loan associations in the area have the following capital structures:

| | |
|---|---|
| First National Bank, Fayetteville, Ark. | $5,495,291 |
| McIlroy Bank, Fayetteville, Ark. | 3,639,539 |
| First National Bank, Springdale, Ark. | 3,051,056 |
| First State Bank, Springdale, Ark. | 2,382,857 |
| Bank of Elkins, Elkins, Ark. | 339,311 |
| First Fed. Sav. & Loan Asso., Fayetteville, Ark. | 1,114,837 |
| Fayetteville Sav. & Loan Asso., Fayetteville, Ark. | 1,550,959 |
| American Sav. & Loan Asso., Springdale, Ark. | 1,502,579 |

It is readily apparent that each of the competing commercial banks in the immediate area of the proposed new bank except one have a capital structure of at least twice that accepted by the defendant for the proposed bank. This comparatively small amount of capital was approved in spite of undisputed findings in the administrative record that the banking need in the area was for larger banks, not for more banks. (A.F. p. 60.)

The administrative record also reflects that the organizers planned to hold 45% of the stock of the new bank, and that the group planned to borrow the entire amount of their respective stock costs from the City National Bank, Fort Smith, Arkansas. (A.F. p. 62). In the letter approving the application, the Deputy Comptroller required that none of the organizers could borrow in excess of 50% of the cost of the stock. (A.F. p. 2.) This requirement is, of course, in the public interest. However, it is not clear how the requirement will prevent the undesirable result of the lending institution having control of the new bank. Certainly, the lender will still require a pledge of the stock to secure the loan. Further, such a result may well violate the new Arkansas statute of March 5, 1973, relating to branch banking, Section 2(c) of which provides that no Ar-

kansas bank shall establish a branch outside the county in which its main office is located. If the lender bank effectively has control of the new bank through pledged stock, then the new bank may well be a branch of the lender. In any event, control of the new bank by another banking organization is certainly undesirable.

(2) The second factor which may be investigated by the defendant is the earning prospects of the proposed bank. The memorandum of the Deputy Comptroller makes no mention of the earning prospects (A.F. pp. 10–12). At the public hearing the applicants introduced five witnesses, one of whom was Dr. Gene C. Lynch, and the protestants introduced five witnesses, one of whom was Dr. John E. Kane. Both witnesses expressed opinions relative to the earning prospects of the proposed bank.

Professor Lynch is Associate Professor of Finance at the University of Arkansas, and has taught at various times commercial banking, money and banking, investments, financial institutions, real estate and finance. Presently he is concentrating primarily on financial institutions and real estate finances. In his study of the Northwest Arkansas territory, and particularly the Fayetteville-Springdale area, he prepared a book or report entitled "Northwest National Bank of Fayetteville, Proposed Economic Justification." His testimony as to the prospects of a proposed bank is based almost entirely upon his opinion of the future growth and needs of the area. He estimated that the City of Fayetteville would have a population of 76,000 by the year 2000, and that Springdale was expected to have a population of over 45,000, or a combined population of 120,000 in the year 2000. Upon this prospect he reached a conclusion that there is need for a new national bank in north Fayetteville. He testified that he thought the bank would be profitable based largely upon his projection of income over a period of years. He said that the bank would lose during its first year, but in the third year he projected

it would make a profit of $90,000 based upon projected deposits of 6.3 million.

Dr. Kane has been with the University of Arkansas since 1946 as an Assistant, an Associate Professor, and Professor and has served in various capacities, such as Chairman of the Department of General Business, Chairman of the Department of Economics, and Associate Director of the Bureau of Business and Economic Research. He has taught primarily in accounting, economics and finance. At the present his main courses are in money and banking at the graduate level. He has taught banking management, courses in statistics and other kindred subjects. He has been associated with various banking educational efforts for 14 or 15 years and has been a member of the faculty of the Southwest School of Banking in Dallas and the Assembly of Bank Directors, a national organization. In other words, he has been closely connected in banking management and has encountered practically every problem that arises in the operation of banks. He is a Director of the McIlroy Bank in Fayetteville, which is one of the chief protestants and a plaintiff. He had studied the application for the establishment of the Northwest National Bank, and outlined fully his reasons for being opposed to the granting of a charter. One of his reasons for objecting to the creation of a new bank is that the area contains an excessive number of banks, and he believes that the present area institutions should be allowed to continue to grow without dilution, on the ground that the need is for greater and stronger banks. He compared the northwest Arkansas area with other areas in Arkansas and is firmly convinced that there is no need for the creation of a new bank.

The testimony of these two witnesses with their exhibits is voluminous. Their opinions are based upon their individual conclusions of the mass statistics. The court is of the opinion that Dr. Kane's testimony is hinged more closely to the actual facts and conditions that exist in the area than the testimony of Dr. Lynch.

Apparently the defendant gave no consideration to this factor in reaching his conclusion as to the need of a new bank in that area. It may be that if the various projections and opinions of Dr. Lynch materialize, there will be a need for another bank in the area in the year 2000, but certainly not at this time.

(3) The third factor that may be investigated according to the regulations issued by the defendant is the convenience and needs of the community to be served by the proposed bank. In this regard the memorandum of the Deputy Comptroller does not truly state the actual findings of the National Bank Examiner who made the field investigation and the Regional Administrator. He also ignores the recommendations of the Director of the Bank Organization Division and the economist. In his memorandum to the Comptroller he quotes the Examiner as follows:

"The Field Investigation report reflects the following comments by the Examiner, 'there is a need for stronger commercial banks in the northwest corner of Arkansas * * *.'" (A.F. p. 11.)

The record shows that the Examiner and the Regional Administrator stated:

"It is apparent that there is a need for stronger commercial banks in this northwest corner of Arkansas. Most of the light industrial concerns now obtain their major borrowings from larger institutions. Granted many will continue to do so, even with a larger bank with greater lending power, but many could now benefit from a reasonable capital base in this city. The poultry industry is quite active, but presents a high degree of risk due to its nature. Prices fluctuate greatly and require the strong ability of a larger bank to finance their business.

"The organizers state the present banking services are adequate and that their interest is generally aimed at future growth. They expect that

there will be adequate growth to provide excellent opportunity for a third bank in Fayetteville. It is apparent that little consideration has been given to the total market situation as this examiner views it. The area is presently served by two commercial banks and two savings and loan associations in Fayetteville. In addition, two quite competitive commercial banks and one savings and loan association serve the proposed area greatly from the Springdale area. It would appear that the present need for banking facilities could be more adequately served by branches of the present institutions." (A.F. p. 60.)

"Although some need exists for more banking outlets in the area the public interest would be better served by larger banks and additional convenience branches rather than a new institution." (A.F. p. 63.)

The Regional Administrator was also of the opinion that the need for other outlets would be adequately fulfilled when the new law concerning branch banking was passed by the Arkansas General Assembly. (A.F. 63.) As heretofore stated, the law became effective March 5, 1973. The exact words of the Regional Administrator are:

"In the event the statutory change is made, the existing banks in Fayetteville and Springdale will be in a position not only to furnish better service through present outlets but to establish new branches in growth areas. Thus, any public need for a new bank, per se, would be largely negated."

Thus, the memorandum of the Deputy Comptroller clearly does not accurately represent the findings of the field investigator or of the Regional Administrator who held the public hearing.

The file as now completed contains an abundance of evidence to support the findings of both the Examiner and the Regional Administrator. Even the applicants stated that present banking services are adequate. (A.F. 60.) The

immediate area of the site of the proposed bank is served by four commercial banks and three savings and loan institutions. (A.F. 19 & 20.) There is a need in the area for larger banks. (A. F. 57.) Allowing the new bank to open would dilute the growth of the existing institutions. (A.F. 55.) As compared to other similar areas in the state, the Springdale-Fayetteville service area is presently heavily serviced by banks and savings and loan institutions. (A.F. 64.) The population per bank in the Fayetteville-Springdale service area is lower than that in any other similar area of the state. (A.F. 72). Deposits per bank in the Fayetteville-Springdale area are also lower than in other comparable areas in the state. (A.F. 77.) In terms of convenience to the public, the existing bank facilities would be more convenient to public access for 63% of the primary service area of the new bank than would the proposed new bank. (A.F. 94.) Most people interviewed by the examiner indicated that present banks were serving the needs quite adequately. (A.F. 47.) Facts in the administrative record tending to indicate that there is no need for a new bank could be recited indefinitely. The Deputy Comptroller not only misinterpreted the findings of the subordinates but is simply incorrect when he states that those findings were not based upon evidence in the record. The report of the Deputy is not in accord with the facts and is capricious and arbitrary. Since the defendant's decision is based upon the recommendation and views of the Deputy, it is clearly arbitrary if not capricious.

The fourth and fifth factors listed by the defendant as permitting consideration are closely related and will be treated jointly herein. The fourth is the character and general standing in the community of the applicants, prospective directors, proposed officers, and other employees, and other persons connected with the application or to be connected with the proposed bank. The banking ability and experience of the proposed

officers and other employees is the fifth factor. In order to show the handling of this matter by the Deputy Comptroller, his reference thereto in his memorandum (A.F. 10) is quoted below in full:

"The directorate as proposed appears to be representative of the business and professional ranks of the community and it is believed they are qualified from a review of the record to provide proper guidance for this new bank.

"It should be noted that the Examiner does not recommend certain of the organizers as directors; however, this recommendation is not supported by the record and is a personal judgment without basis in the record.

"The proposed president [John S. Cook] appears to be qualified from a review of the record; however, it should be noted that the Regional Administrator states, 'The proposed president appears to have sufficient experience in banking but not in the areas or functions in which the bank will engage.'

"On balance, the record does not support the adverse recommendation of the Examiner and Regional Administrator and it is recommended that Mr. Cook be approved as President."

The above statements that the subordinates' recommendations were not supported by the record are used by the Deputy to attempt to offset some rather critical findings by the subordinates. The findings of the commissioned bank examiner who made the field investigation on the application are as follows:

"Even though the proposed bank could be expected to operate at a modest level, its effective contribution to the community would be less than desired. The organizers lack banking experience and the managing officer is only mediocre. The examiner questions the degree of influence exercised by the organizing group in the community. It is also concluded that the proposed directorate has the capacity for

some degree of self-serving. While the individual deficiencies of the various organizers are not critical when viewed in isolation, these weaknesses combined, reveal a group of persons lacking sufficient strength, confidence and ability to properly serve the public interest. It is recommended that this application be disapproved." (A. F. p. 60.)

The Regional Administrator who held the hearing on the application made the following findings:

"Of the ten organizers, nine of which are to be directors, only two have had past experience in banking. Furthermore, several of the group have reputations as speculators or are engaged in business enterprises which indicate a high probability of use of the bank for self-dealing purposes. In this connection, it will have been noted that the organizers will wholly own the real estate holding company affiliate and the bank's blanket bond will be handled by a company owned by Organizer Stanton.

"The proposed president of the new institution appears to have sufficient experience in banking, but not in the areas or functions in which the bank will engage. Accordingly, he is not recommended for acceptance as the chief executive officer.

"The organizing group plans to subscribe to 18,000 (45%) of the shares outstanding and the remainder is to be widely distributed throughout the community. It is pertinent to note, however, that the group plans to borrow the entire amount of their respective stock costs from the City National Bank, Fort Smith, Arkansas, presumably pledging much of the stock to their loans. Consequently, the lender could be in practical control of the bank from a collateral position.

\* \* \* \* \* \*

"Although the investigating examiner's public contacts did not reflect any particular enthusiasm for a new bank, this office subsequently received some

80 letters from merchants and others requesting that this proposal be approved. In addition to the fact that the letters were received after the comment period provided in 12 C.F.R. 5.4, the public hearing disclosed that at least one of the letters was not authentic. (Refer to pages 124 and 125 of the hearing transcript). Subsequently, it was disclosed that Organizer Eoff had prepared the letter and signed an associate's name to it which casts doubt on the validity of the remaining communications." (A.F. p. 62.)

"With few exceptions, the organizing group is comprised of individuals whose service as directors could be detrimental to the bank or who would provide little business acument to the Board's deliberations * * *." (A. F. p. 63.)

These rather strong statements are simply brushed aside by the Deputy's comment that they are personal judgments not supported by the record. It should be noted here that the defendant has assured Congress that each application received by him will be investigated by a commissioned bank examiner "who is a thoroughly competent career professional and who commands the confidence of his superiors." Federal Banking Law Service, Bank Regulation Index (A.S. Pratt & Sons, Inc., p. 244.40).

To determine whether such findings may be so lightly regarded by the Deputy, further brief reference to the record is emphasized to determine whether the findings were in fact "personal judgments without basis in the record." The portion of the administrative record for which the defendant has claimed a privilege from disclosure deals with the character and ability of the applicants, and have now been furnished. An examination of the complete file furnishes ample corroboration and support for the conclusions of the subordinates. Their conclusions are not personal judgments but are based upon the administrative file. Only two of the nine applicants have had any banking experience whatever. (A.

F. p. 15.) The applicants were unable to generate any public enthusiasm for the new bank. (A.F. p. 62.) One applicant owns the insurance agency through which the fidelity bond of the employees of the new bank is to be written. (A.F. p. 62.) One applicant owns land adjacent to the proposed site of the new bank. (A.F. p. 59.) The organizers paid $2,000 for a market survey and did not report the expenditure as required by the application. (A.F. p. 59.) The organizers obtained legal service in protesting a relocation application of one of the plaintiffs and also failed to report this expenditure as required by the application. (A.F. p. 59.) The organizers proposed to own the company which would lease the land and building to the new bank. (A.F. p. 59.) The organizers proposed to borrow the entire amount of their respective investments in the new bank. (A.F. p. 59.) One organizer signed the name of an associate to a petition letter. (A.F. p. 62.) Several of the persons interviewed by the Examiner expressed concern with the ability and sincerity of some of the organizers. (A.F. pp. 48–49.) Several of the organizers have reputations as speculators. (A.F. p. 62.) One of the executives of an existing bank disclosed that he had in the past been a next door neighbor to one of the organizers and had serious reservations about his ability and sincerity in supervising a commercial bank. (A.F. p. 48.) Not a single one of the local people contacted by the Bank Examiner indicated that he would do business with the new bank. (A.F. p. 47.) The experience of the managing officer has been in the field of international banking. (A.F. p. 44.) The estimate of the applicants that the operations of the new bank would be profitable within the second year was considered totally unrealistic by the Regional Administrator. (A.F. p. 62.) In summary, there is an abundance of facts in the record which supports the findings of the Examiner and Administrator that the applicants were lacking in strength and ability. That part of the adminis-

trative record which tends to indicate that the organizers are qualified are some 80 letters referred to by the Regional Administrator received out of time by the Regional Office. Of these letters, 23 are by the organizers, family of the organizers, or business associates of the organizers. Eight of the letters deal with integrity or ability. One of the letters was not authentic in that the purported signature was placed thereon by one of the organizers. Some of the letters and documents received in camera refer to the qualifications and lack of qualifications, but on the whole do not dispute the statements made by the Chief Examiner and the Regional Administrator.

The Deputy Comptroller has attempted to avoid the proper findings of the two subordinates and to substitute patently unsupported conclusions in their stead. The defendant has asserted that it is his duty to assure that national banks are "soundly and honestly managed." (Affidavit of Defendant in support of motion for protective order.) A failure to consider facts bearing upon the honesty, integrity and ability of the organizers is surely arbitrary and capricious action.

The defendant in his brief filed herein does not point to any facts in the record which support a conclusion that the organizers are capable of operating a commercial bank properly. Rather, he asserts that the protestants did not challenge the character, integrity or ability of the applicants at the administrative hearing and are thereby prevented from doing so now. This contention is made in the face of the fact that several officers of the plaintiffs indicated to the Examiner that they questioned these characteristics of the organizers. (A.F. pp. 48–49.) Even if there had been no protest at all the defendant has the duty to inquire as to character, ability, integrity and honesty of the organizers. 12 C.F.R. § 4.2(b). In the opinion of the court the defendant did not give proper consideration to these relevant factors

even after his subordinates had compiled facts in regard to the same.

■ In summary, the administrative record herein indicates that the defendant did indeed act arbitrarily and capriciously. He has apparently relied upon a memorandum of a Deputy which perverts the findings of four subordinates in regard to need. He has not given consideration to the only evidence in the record which reflects upon the character, reputation, and ability of the organizers. To the contrary, he has relied upon a memorandum of a Deputy that so obviously disregards facts in favor of unsupported conclusions that it seems to indicate a bias on the part of its author. A failure to consider relevant factors is arbitrary action. Citizens to Preserve Overton Park, Inc. v. Volpe, supra. As recently as August 13, 1973, the United States Court of Appeals for the Eighth Circuit reversed and remanded a decision back to the defendant for the defendant's failure to consider one factor relevant to the decision. See, Driscoll v. Northwestern National Bank of St. Paul (8 Cir. 1973), 484 F.2d 173.

The defendant contends that the findings of the Deputy Comptroller, upon which the defendant's decision is based, should not be set aside upon the challenge made by the plaintiffs. A careful reading of the decision in Camp v. Pitts, supra, discloses that the Supreme Court did not overturn the decision of the Court of Appeals in that regard. The Court simply ruled that the Appeals Court could not require the de novo hearing by the District Court when there is a finding of an inadequate administrative record. It should be borne in mind that this is an action by plaintiffs in which they are seeking judicial review of the Comptroller's adjudication upon the entire record or administrative file. In such a proceeding the proper standard for a judicial review is whether the Comptroller's adjudication was arbitrary, capricious and an abuse of discretion or otherwise not in accordance with the law as specified in 5 U.S.C., § 706(2)(A).

In Hughes Air Corp. v. Civil Aeronautics Board (9 Cir. 1973), 482 F.2d 143, the court beginning at the bottom of page 145 said:

"Admittedly the scope of our review is narrow. See 5 U.S.C. § 706. However, we may set aside agency action which is arbitrary or an abuse of discretion if 'this court should be of opinion that [the] action was clearly wrong.' Bates & Guild Co. v. Payne, 194 U.S. 106, 109, 24 S.Ct. 595, 597, 48 L.Ed. 894 (1904). We are convinced that these orders were clearly wrong and therefore they are unenforceable."

 The plaintiffs have argued on their brief that the defendant is subject to the provisions of the National Environmental Policy Act and cite First National Bank of Homestead v. Watson (D.C.1973), 363 F.Supp. 466, where the court held that the Act requires each agency of the Government to consider the effect of its actions as those actions relate to the environment and to set up procedures which will assure a fair and informed preliminary decision in regard thereto. In the instant case there is nothing in the administrative file or record which indicates that the defendant considered the effect of a decision upon the environment. Also, the regulations issued by the defendant do not indicate that he has established any procedure to insure consideration of the environmental factor. However, the failure to conduct an investigation and determine the impact of the establishment of the bank as proposed will have on the environment does not in itself require the court to set aside the action of the Comptroller. Hanly v. Kliendienst (2 Cir. 1972), 471 F.2d 823.

Upon a consideration of the entire administrative file, the court is convinced that there is ·no rational basis in the record for the Comptroller's decision; that there is no genuine issue as to any material fact, and that the action of the defendant Comptroller was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

Judgment should be entered granting plaintiffs' motion for summary judgment; overruling defendant's motion for summary judgment; and remanding the application to the Comptroller for further consideration and action in accordance with the law and in the manner as herein stated.