Dominick **SAFFIOTI**, Plaintiff,

v.

**Malcolm WILSON**, Governor of New
York State, et al., Defendants.

No. 74 Civ. 3390 (JMC).

United States District Court,
S. D. New York.

March 24, 1975.

Dominick Saffioti, pro se.

Louis J. Lefkowitz, Atty. Gen. (David L. Birch, Asst. Atty. Gen., New York City, of counsel), for defendants.

## OPINION AND ORDER

CANNELLA, District Judge:

Article IV, Section 7 of the Constitution of the State of New York provides that,

> [e]very bill which shall have passed the senate and assembly shall, before it becomes a law, be presented to the governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it shall have originated . . . .

In this novel case, Dominick Saffioti asks us to review former Governor Wilson's exercise of the broad based veto

power accorded him by the State Constitution and, in effect, to set it aside as being an arbitrary and capricious deprivation of due process. While we find that the review of a governor's exercise of the veto power may properly be had in a civil rights action of the instant nature (42 U.S.C. § 1983), we conclude that Governor Wilson acted neither arbitrarily nor capriciously in vetoing the private bill which had been passed for Mr. Saffioti's benefit. Accordingly, we hereby dismiss the complaint as to all defendants pursuant to Fed.R.Civ.P. 56(b).[1]

## THE FACTS

Dominick Saffioti, a carpenter by trade, is no stranger to the state and federal courts. See Saffioti v. Catherwood, 305 F.Supp. 989 (S.D.N.Y.), aff'd, 417 F.2d 971 (2 Cir. 1969) (per curiam), cert. denied, 397 U.S. 956, 90 S. Ct. 988, 25 L.Ed.2d 140 (1970); Saffioti v. Catherwood, 28 A.D.2d 1013, 283 N. Y.S.2d 738 (3rd Dept.), leave to appeal denied, 21 N.Y.2d 641, 287 N.Y.S.2d 1025 (1967), denied on reconsideration 21 N.Y.2d 643, 288 N.Y.S.2d 1026 (1968). In view of these earlier opinions, the events which give rise to Mr. Saffioti's litigious course are briefly stated. See, Saffioti v. Catherwood, 305 F.Supp. at 990 (Bonsal, J.).

In 1962, at a time when the plaintiff was receiving unemployment insurance benefits from the State of New York, an investigator for the New York Department of Labor discovered that Saffioti was placing advertisements in Newburg, New York newspapers which solicited offers on various parcels of real estate. Further investigation revealed that plaintiff held a real estate salesman's license and was working for one Joseph Parisi, a licensed real estate broker.

As the result of this investigation, an administrative proceeding was instituted. After a hearing, the Referee determined that plaintiff had made false statements in connection with his application for unemployment insurance benefits, and that he was not totally unemployed as required by New York Labor Law, McKinneys Consol. Laws, c. 31, § 522. Accordingly, the Referee ordered that Saffioti's unemployment insurance

1. In acting as we now do, we recognize that [i]n considering whether [plaintiff's] complaint states a cause of action under section 1983 for violation of his constitutional rights, the allegations must be accepted as true, Cooper v. Pate, 378 U.S. 546 [84 S. Ct. 1733, 12 L.Ed.2d 1030] (1964), and the complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief, Conley v. Gibson, 355 U.S. 41, 45–46 [78 S.Ct. 99, 2 L.Ed.2d 80] (1957). Moreover, pro se complaints such as this must be liberally construed. Haines v. Kerner, 404 U.S. 519 [92 S.Ct. 594, 30 L.Ed.2d 652] (1972).

Williams v. Vincent, 508 F.2d 541, at 543 (2 Cir. 1974). See also, Clay v. Martin, 509 F.2d 109 (2 Cir. 1975); Patterson v. MacDougall, 506 F.2d 1, 2–3 (5 Cir. 1975).

After reading Mr. Saffioti's homedrawn complaint, to which he had appended a copy of the Governor's veto message, and finding it to be not entirely clear either with regard to the claim raised or the relief sought, we requested that he appear before the Court and state his position for the record. This he did on February 7, 1975.

Having now heard Mr. Saffioti and having afforded him the opportunity to clarify and expand upon the allegations of his complaint, we find that the defendants are entitled to judgment. Although these officials have moved the Court pursuant to Fed.R.Civ.P. 12(b)(6), we find that relief under that rule is not here available because Saffioti has indeed stated a claim cognizable under § 1983. However, as that Rule allows us to treat a motion made thereunder "as one for summary judgment," the Court invokes the provisions of Rule 56 here.

Rule 56, in turn, allows the entry of summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."

See also, United States ex rel. Larkins v. Oswald, 510 F.2d 583 (2 Cir. Jan. 24, 1975). In the instant case, we accept every fact alleged by Mr. Saffioti to be true and correct, however, we conclude that, as a matter of law, he is entitled to no relief—the facts do not measure up to arbitrary and capricious conduct. See discussion pp. 1345–1347. Cf., Bay City-Abrahams Bros., Inc. v. Estee Lauder, Inc., 375 F. Supp. 1206, 1208–09 n. 1 (S.D.N.Y.1974).

benefits be reduced and that he be required to make restitution of some $1,025 to the state. Thereafter, on three separate occasions, the Unemployment Insurance Appeals Board affirmed the decision of the Referee without modification. These administrative decisions were subsequently affirmed by the state appellate courts. Saffioti v. Catherwood, 28 A.D.2d 1013, 283 N.Y.S.2d 738 (3rd Dept.), leave to appeal denied, 21 N.Y.2d 641, 287 N.Y.S.2d 1025 (1967), denied on reconsideration, 21 N.Y.2d 643, 288 N.Y.S.2d 1026 (1968).

Upon the conclusion of the state court proceedings, Saffioti commenced a civil rights action in this court. Plaintiff alleged "that he had been found guilty of fraud and misrepresentation, without due process of law and in violation of his constitutional rights." 305 F.Supp. at 990. After hearing argument on the matter, Judge Bonsal concluded that plaintiff had not been found guilty of any crime, but only that he was found not to be totally unemployed; that he had not been deprived of due process in the state forums and that "he ha[d] alleged no violation of his Federal constitutional rights." *Id.* at 991. Accordingly, Judge Bonsal granted summary judgment dismissing the complaint. The district court's decision was unanimously affirmed by the Court of Appeals for the Second Circuit, which stated that "we find that [Saffioti] received due process in compliance with the requirements of state law, and that there is no merit to his claims that he has suffered the loss of any federal constitutional protection." 417 F.2d at 971. The Supreme Court of the United States denied *certiorari.* 397 U.S. 956, 90 S.Ct. 988, 25 L.Ed.2d 140 (1970).

Having thus failed to secure the reversal of the unemployment insurance referee's determination in either the state or federal courts, Saffioti commenced an action in the New York Court of Claims (Motion No. 12571) in which he alleged that the administrative proceedings against him had been negligently instituted by the unemployment insurance investigator. A recovery of $100,000 was sought from the State. After hearing the matter, Judge Milton Alpert of the Court of Claims issued an order (March 31, 1970) dismissing the complaint upon the ground that it was time-barred under the statute of limitations contained in New York Court of Claims Act § 10. Rather than enter an appeal from this determination, Mr. Saffioti sought the assistance of the New York Legislature in the form of a private bill.

In each of the last three New York legislative sessions (1972, 1973 and 1974), Mr. Saffioti succeeded in securing the approval of both houses of the New York Legislature for a private bill which, in effect, waived the applicable statute of limitations and conferred jurisdiction upon the New York Court of Claims to hear his case. In its most recent version ((1974) Assembly Int. No. 10600 (Mr. Herbst)) the legislation provided that:

> Jurisdiction is hereby conferred upon the court of claims to hear, audit and determine the claim or claims of Dominick Saffiati [sic] against the state alleging negligence in behalf of the state and for the return of monies allegedly wrongfully withheld from him by the state.[2]

On each occasion of its passage, however, this legislation was vetoed by the Governor: twice by then Governor Rockefeller and once by then Governor Wilson. It is to the latter veto cast by Governor Wilson that this action is addressed.

In exercising his veto against the enactment of "Mr. Saffioti's bill," Governor Wilson stated:

> The bill would confer jurisdiction on the Court of Claims to hear and determine the claims of Dominick Saf-

---

2. As with most private bills, the measure in Mr. Saffioti's favor was unanimously passed by both houses of the New York Legislature during the 1974 Session.

fiati [sic] against the State for negligence and the return of monies allegedly wrongfully withheld from him by the State.

The bill, which is identical to one disapproved by my predecessor (1973 Assembly Bill 4524, Disapproval Memorandum No. 140) does not describe the nature of the claim alleged nor specify the date on which it is alleged to have accrued. As noted last year, however, it appears from extrinsic evidence that the claim relates to a ruling by the Department of Labor in an unemployment insurance matter, which ruling was adverse to the claimant. That ruling has been fully litigated administratively and in both state and federal courts. The bill, therefore, is not necessary to assure claimant his day in court.

Disapproval of the bill is recommended by the Attorney General, the State Comptroller and the Labor Department.

The bill is disapproved.

(Governor's Disapproval Memorandum No. 28 (June 10, 1974)).

Mr. Saffioti presently alleges that, in so acting, the Governor exercised his authority arbitrarily and capriciously in that Mr. Wilson relied solely upon the fact that plaintiff had litigated the matter in numerous forums and concluded therefrom that a further hearing in the Court of Claims was "not necessary to assure [Saffioti] his day in court." In view of this allegedly unconstitutional conduct by Governor Wilson, plaintiff asks that, notwithstanding the veto, we direct the New York Court of Claims to hear his case.[3] In addition, since the Attorney General, Comptroller and Labor Commissioner recommended the veto of "his" bill, plaintiff has named each as a defendant herein as well, although he does not state what additional relief is sought in view of their joinder.

## DISCUSSION

### I.

■ While it is undeniably true that access to the courts and an opportunity to be heard are fundamental aspects of procedural due process,[4] it is equally clear that the bar imposed by a validly enacted and reasonable statute of limitations does not deprive a suitor of his day in court in derogation of that clause.[5] Thus, for example, Mr. Saffioti

---

3. As Mr. Saffioti put it:

I came before this Court because I understand this was my avenue, that this Court does have jurisdiction and power to grant me to be heard by the Court of Claims. That's all I'm seeking, is to be heard by the Court of Claims.

(Transcript of Hearing at 12.) Were the facts of this case to warrant a finding that Governor Wilson did act arbitrarily and capriciously, it is conceivable that relief of the nature sought could be granted. Had Mr. Saffioti named the judges of the Court of Claims as defendants in this proceeding, then, under the authority of § 1983, this Court might have issued an injunction barring their enforcement of the statute of limitations with regard to his claim. Cf., Wyatt v. Aderholt, 503 F.2d 1305, 1316–18 (5 Cir. 1974); Hawkins v. Town of Shaw, 461 F.2d 1171 (5 Cir. 1972) (en banc), aff'g, 437 F.2d 1286 (1971).

4. As the Court of Appeals for the Second Circuit has stated: "Under our Constitution there is no procedural right more fundamental than the right of the citizen . . . to tell his side of the story to an impartial tribunal." Winders v. Miller, 446 F.2d 65, 71 (2 Cir.), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971). See also, Fuentes v. Shevin, 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Comment, The Heirs of Boddie: Court Access for Indigents after Kras and Ortwein, 8 Harv.Civ.Rights—Civ. Lib.L.Rev. 571 (1973).

5. As one court has stated:

Statutes of limitation have been part of the law of every civilized nation from time immemorial. Since each sovereignty may organize its judicial tribunals according to its own notions of policy, it has been recognized since the early days of this republic that statutes of limitation are within the sovereign power of each state to enact. (Citation omitted). Such statutes, having the effect of denying any judicial remedy for the enforcement of an otherwise valid claim, are justified on grounds

could not successfully challenge the dismissal of his Court of Claims action on due process grounds and he does not do so here. Rather, he alleges that the Governor acted arbitrarily and capriciously in vetoing the bill which accorded him the privilege (legislative grace) of reviving his otherwise time-barred action in the Court of Claims.

### A. *Justiciability*

Upon our initial consideration of Mr. Saffioti's complaint, we were possessed of grave doubts concerning its justiciability, as well as whether it stated a claim cognizable in a federal court. As the Supreme Court has noted, "the problems that would be involved in a federal court's ordering the Governor of a State to exercise his discretion in a particular way" could well be regarded as insuperable. Carter v. Jury Comm'n, 396 U.S. 320, 338, 90 S.Ct. 518, 528, 24 L.Ed.2d 549 (1970). *Compare*, the concurring opinion of Mr. Justice Black, 396 U.S. at 341, 90 S.Ct. at 529; and *see also*, Mayor v. Educational Equality League, 415 U.S. 605, 615, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *cf.*, James v. Valtierra, 402 U.S. 137, 142, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). Principles of comity and federalism must be regarded as placing constraints upon a federal court's role in such affairs. In addition, the Supreme Court has recently recognized that the

doctrine of separation of powers bars a federal court from interfering with the President's exercise of the veto and it was difficult for us to conceive of a different standard with regard to the conduct of a state governor.

The "judicial power of the United States" vested in the federal courts by Art. III, § 1 of the Constitution can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto. Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government.

United States v. Nixon, 418 U.S. 683, 704, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974).[6]

■ After further consideration of the authorities, however, we came to recognize that a truly justiciable controversy is here presented. Mr. Chief Justice Warren well-stated that "the doctrine of justiciability . . . has become a blend of constitutional requirements and policy considerations. And a policy limitation is 'not always clearly distinguished from the constitutional limitation.' (citation omitted)." Flast v.

---

of policy and as statutes of repose "designed to protect the citizens from stale and vexatious claims and to make an end to the possibility of litigation after the lapse of a reasonable time." Guaranty Trust Co. of New York v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1937). The legislative body, in enacting such legislation, may weigh the conflicting interests between one person's right to enforce an otherwise valid claim and another person's right to be confronted with any claim against him before the lapse of time has likely rendered unavailable or difficult the matter of obtaining or presenting proof. Any balance of these conflicting interests which is not arbitrary or capricious is within the legislative authority and not subject to constitutional attack for lack of due process.
Hargraves v. Brackett Stripping Machine Co., 317 F.Supp. 676, 682–83 (E.D.Tenn.

1970). *See also*, Chase Securities Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); Smith v. Allen-Bradley Co., 371 F.Supp. 698, 701 (W.D.Va.1974); Mores v. Feel, 73 Misc.2d 942, 343 N.Y.S.2d 220, 225–29 (Fam.Ct.1973); *cf.*, Lindsey v. Normet, 405 U.S. 56, 64–69, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

6. We note that while "reliance on federal separation-of-powers precedents is in part misplaced, because this case, unlike those authorities, has nothing to do with the tripartite arrangement of the Federal Constitution," such principles do bear upon the role of the judiciary viz-a-viz oversight of discretionary executive action responsive to the needs of elected officials. Mayor v. Educational Equality League, 415 U.S. at 615, 94 S.Ct. 1323. *See also*, Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). *See also,* United States v. Richardson, 418 U.S. 166, 172, 94 S.Ct. 2940, 2944, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). In the matter at bar, we perceive no constitutional limitation upon the exercise of our jurisdiction and, although we regard the principles of comity, federalism and separation of powers as interests which affect the scope of our review, we can not say that this cause is not justiciable because of their existence.[7]

In the present case, we neither engage in an attempt to usurp the veto power of the Governor nor in an effort to dictate how executive discretion should be exercised. We do not undertake an ongoing review of the Governor's exercise of the veto power or seek to substitute our judgment for that of a duly elected chief executive. *See,* Gilligan v. Morgan, 413 U.S. 1, 10–12, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). Rather, we review the actions of the executive in a fashion which is not unlike that exercised by other federal courts in more common settings (i. e., prisoners, public employee termination, school board actions and the like). *Cf.,* United States ex rel. Monty v. McQuillan, 385 F.Supp. 1308 (E.D.N.Y. 1974) (review of gubernatorial appointment of judge to preside at an extraordinary term pursuant to Article VI § 27 of the New York Constitution).

■ In addition, as the existence "of judicially discoverable and manageable standards" for the resolution of a given dispute are essential elements of justiciability, Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), we note that state courts have traditionally reviewed the actions of a governor who is alleged to have exercised his veto in excess of the authority granted by the state constitution.[8] *See, e. g.,* the cases collected in 39 Mo.L.Rev. 105 (1974); *cf.,* Fitzsimmons v. Leon, 141 F.2d 886, 888 (1 Cir. 1944) (Governor of Puerto Rico). As one state court has

---

**7.** At first blush, it appeared to us that the "political question" doctrine might have a bearing upon the justiciability of this matter. However, as the Court made clear in Baker v. Carr, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" The justiciability of a case such as this was pointed up by the Court in Baker v. Carr in the following words:

We come, finally, to the ultimate inquiry whether our precedents as to what constitutes a nonjusticiable "political question" bring the case before us under the umbrella of that doctrine. A natural beginning is to note whether any of the common characteristics which we have been able to identify and label descriptively are present. We find none: The question here is the consistency of state action with the Federal Constitution. We have no question decided, or to be decided, by a political branch of government coequal with this Court. Nor do we risk embarrassment of our government abroad, or grave disturbance at home if we take issue with Tennessee as to the constitutionality of her action here challenged. Nor

need the appellants, in order to succeed in this action, ask the Court to enter upon policy determination for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action.

*Id.* at 226, 82 S.Ct. at 714. As to that aspect of justiciability which concerns "standing," *see,* n. 10, *infra.*

**8.** In like fashion, federal courts have, in the past, engaged in review of the President's exercise of the veto power conferred by Art. I, § 7, clause 2 of the United States Constitution (which is set out in part at n. 12, *infra*) to determine whether his actions have exceeded the scope of the authority granted thereunder. Such cases are typified by the recent decision of the District of Columbia Circuit in the pocket veto case, Kennedy v. Sampson, 511 F.2d 430 (D.C.Cir. 1974) (and the cases there cited). *Cf.* Schick v. Reed, 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974) (presidential pardon power under Art. II, § 2, clause 1).

recently stated upon the review of a governor's veto:

> [R]espondents contend the Governor cannot be compelled to exercise his veto power or to exercise it in a particular manner, and that an exercise of the veto power by the Governor requires the exercise of judgment and discretion, which is not a subject of judicial control. *We fully agree that the exercise of the veto power requires judgment and discretion on the part of the Governor and that he cannot be compelled by the Legislature or by this Court to exercise this power or to exercise it in a particular manner. We do not agree, however, that the manner in which the Governor exercises the power is beyond judicial review or judicial control, if the manner in which it is exercised is beyond the Governor's constitutional authority.* The power of veto, like all powers constitutionally conferred upon a governmental officer or agency, is not absolute and it may not be exercised without any restraint or limitation whatsoever. The very concept of such absolute and unrestrained power is inconsistent with the concept of "checks and balances," which is basic to the form and structure of State government created by the people of New Mexico in their constitution, and is inconsistent with the fundamental principle that under our system of government no man is completely above the law. (Citation omitted and emphasis added).

State of New Mexico ex rel. Sego v. Kirkpatrick, 86 N.M. 359, 524 P.2d 975, 978 (1974).

█ In the present case, the review which is undertaken by this Court is not dissimilar to that invoked by state courts in years past. Rather than give consideration to the scope of the Governor's veto power under state law, we must assure ourselves that the Governor, in the exercise of his negative, has not exceeded the power granted to the states by our federal Constitution or otherwise deprived any citizen of federally protected rights.

**B. *Is a federally cognizable claim presented?***

█ We believe that federal courts are obligated to ensure that in acting to approve or disapprove legislation a state governor has not offended the federal Constitution. The Supreme Court has recently reaffirmed the efficacy of federal court review of high-level state executive action when it stated that "§ 1983 would be drained of meaning were we to hold that the acts of a governor or other high executive officer have 'the quality of a supreme and unchangeable edict, overriding all conflicting rights of property and unreviewable through the judicial power of the Federal Government' [citation omitted]." Scheuer v. Rhodes, 416 U.S. 232, 248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974).[9]

Imagine, for example, an instance where a governor states in his veto message, "I hereby veto this bill because it will unduly benefit the black citizens of this state." Could anyone argue that such action not be made subject to federal court scrutiny? Mr. Chief Justice Hughes long ago recognized the fallacy of placing a governor's actions beyond the scope of federal judicial review in these words:

> If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise

---

9. For a further discussion of the cognizability of a civil rights claim against high-level government executives in light of the *Scheuer* decision, *see*, Apton v. Wilson, 165 U.S.App.D.C, 22, 506 F.2d 83, 90–95 (1974); Percy v. Brennan, 384 F.Supp. 800, 810 (S.D.N.Y.1974) (viable claim stated against New York Governor and Labor Commissioner for failure to properly administer equal employment opportunity plan); Palmer v. Hall, 380 F.Supp. 120, 123 (M.D.Ga. 1974).

of state power would be but impotent phrases, the futility of which the State may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable. There is no such avenue of escape from the paramount authority of the Federal Constitution. When there is a substantial showing that the exertion of state power has overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression. To such a case the federal judicial power extends (Art. III, § 2) and, so extending, the court has all the authority appropriate to its exercise.

Sterling v. Constantin, 287 U.S. 378, 397–98, 53 S.Ct. 190, 195, 77 L.Ed. 375 (1932), quoted in, Scheuer v. Rhodes, 416 U.S. at 248–49, 94 S.Ct. 1683.

In sum, although principles arising from the nature of our federal system and the role of the judiciary dictate that certain restraints be placed upon our review of the Governor's veto, we find that a justiciable controversy is presented on these facts. The assurance that every man receives the protection of federally guaranteed rights and that no individual places himself above the Constitution is always within the proper scope of a federal court's consideration. Thus, we conclude that the present claim, which alleges that Governor Wilson arbitrarily and capriciously vetoed "Mr. Saffioti's bill" in derogation of the Fourteenth Amendment's due process clause, is properly within the ambit of our adjudicative authority.[10]

---

10. Lest it be thought that we now open the floodgates to Civil Rights actions wherein the governors of the several states will be called upon to justify the exercise of their veto power, the following thoughts are offered. This case presents a rare instance in that it concerns the veto of a so-called "private bill." Thus, Mr. Saffioti's nexus with the legislation can not be questioned. In the usual case, however, a plaintiff seeking to challenge the exercise of the veto will be faced with the serious burden of satisfying the standing requirement of Article III. *See* Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L. Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); Kennedy v. Sampson, 511 F.2d 430, at 433–436 (D.C.Cir. 1974); Holtzman v. Schlesinger, 484 F.2d 1307, 1315 (2 Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). The following principle should serve to preclude most attacks upon the executive's exercise of his negative: "Standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share. Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution . . . ." Schlesinger v. Reservists Committee, 418 U.S. at 220, 94 S.Ct. at 2932.

In addition, the qualified immunity traditionally accorded to executive officers, as well as the doctrine of legislative immunity, will serve to bar any recovery in almost all cases of this sort. (In light of our conclusion herein, we do not reach these issues in this case.) As the Supreme Court recently stated in Scheuer v. Rhodes, 416 U.S. at 247–48, 94 S.Ct. at 1692:

These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

See also, Wood v. Strickland, —— U.S. ——, ——, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Class v. Norton, 505 F.2d 123, 127–28 (2 Cir. 1974); Note, 24 Catholic U.L.Rev. 164, 168–74 (1974); and the cases cited in note 9, *supra.* Given the broad discretionary nature of the executive veto, the scope of the immunity accorded to its exercise should be considerable under the formulation adopted by the Court in *Scheuer.*

## II.

*Did Governor Wilson Arbitrarily and Capriciously Exercise his Veto?*

Having thus determined that Mr. Saffioti has presented a claim which is both justiciable and cognizable by the Court, we turn to consider whether Governor Wilson offended the Constitution by virtue of his actions toward plaintiff's bill.

As a benchmark for our analysis, certain reflections upon the nature of the executive negative are warranted.[11] In *The Federalist No. 73*, Hamilton discussed the scope and nature of the Presidential veto power. Such power, which is almost identically worded to that granted to the Governor of New York,[12] was said to be the executive's shield against legislative encroachment upon his power. The executive negative was also perceived as

> an additional security against the enaction of improper laws. It establish-

es a salutary check upon the legislative body, calculated to guard the community against the effects of faction, precipitancy or of any impulse unfriendly to the public good, which may happen to influence a majority of that body.

Cognizant of this swordlike function of which the veto is possessed, we are better able to understand the context of the Governor's actions.

 The notion that arbitrary and capricious governmental decision-making is offensive to the Constitution stems from the due process clause of the Fourteenth Amendment. Although we have characterized Mr. Saffioti's allegations against the Governor as an arbitrary and capricious deprivation of a privilege, or the use of such terminology does not place the alleged conduct beyond the scope of the due process clause,

---

Lastly, in view of the settled principle that "[i]n exercising the veto power . . . the executive is exercising a legislative power," Fitzsimmons v. Leon, 141 F.2d at 888, that is, in acting with respect to matters presented by the legislature, a governor acts *qua* legislator, in a law making capacity, rather than *qua* executive, in a law executing role, his conduct might be found to be within the scope of legislative immunity as well. *See also*, People v. Bowen, 21 N.Y. 517, 521 (1860). The relevant considerations have recently been summarized in these terms in a case involving, *inter alia*, the actions of a lieutenant governor:

> The protection of the speech or debate clause of the Constitution of the United States has been extended to state legislators. Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). The scope of the privilege granted is not unlimited, but a senate resolution is protected to the same degree as words spoken in actual debate. Gravel v. United States, 408 U.S. 606, 617, 92 S.Ct. 2614, 33 L.Ed. 2d 583 (1972). The passing of acts and resolutions is the very essence of the legislative process, and any attempt to punish a legislator for such actions would manifestly tend to "control his conduct as a legislator," in derogation of the clause. Gravel, supra at 618, 92 S.Ct. at 2623. See United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966) ;

Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) ; Tenney v. Brandhove, supra.

Eslinger v. Thomas, 476 F.2d 225, 228 (4 Cir. 1973) (and the cases cited). *See also*, Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) ; United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

It must be remembered, however, "that the doctrine of immunity . . . has no application to a suit for declaratory or injunctive relief . . . ." Rowley v. McMillan, 502 F.2d 1326, 1331 (4 Cir. 1974). *See also*, Scheuer v. Rhodes, 416 U.S. at 238–40, 94 S.Ct. 1683 ; Richmond Black Police Officers Assn. v. City of Richmond, 386 F.Supp. 151, 154 (E.D.Va.1974).

11. For a general discussion of the exercise and function of the executive veto, see, 1 C. Sands, Sutherland's Statutory Construction § 16.08 at 443–46 (4 ed. 1972).

12. Article I, § 7 clause 2 of the United States Constitution provides that:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States ; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated . . . ..

as well it might have in years past. As one court has aptly stated:

The Fourteenth Amendment is a general prohibition against arbitrary and unreasonable governmental action. It no longer suffices to say that although a government may not deprive someone of a *right* arbitrarily, it may do so in the case of a *privilege.* Goldberg v. Kelly, 397 U.S. 254, 262, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1970), Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The right-privilege distinction has been rejected as a method of analysis in Fourteenth Amendment cases, because the question is not whether a person has a right to something denied by the government, but whether the government acted lawfully in depriving him of it. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L. Ed.2d 90 (1971), and cases cited therein at 539, 91 S.Ct. at 1589, "One may not have a constitutional right to go to Bagdad, but the government may not prohibit one from going there unless by means consonant with due process of law." [Homer v. Richmond, 110 U.S.App.D.C. 226, 292 F. 2d 719, 722 (1961)].

Thompson v. Gallagher, 489 F.2d 443, 446 (5 Cir. 1973). *See also* Beatham v. Manson, 369 F.Supp. 783, 790–92 (D. Conn.1973). Thus, we must determine whether, in exercising his veto with regard to plaintiff's private bill, Governor Wilson arbitrarily and capriciously denied Saffioti the privilege of appearing before the Court of Claims. Of course, if we find the Governor not to have so acted, no relief would lie against him or the other defendants.

Judge MacMahon has defined the terms arbitrary and capricious in the following fashion:

The terms "arbitrary" and "capricious" embrace a concept which emerges from the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution and operates to guarantee that the acts of government will be grounded on established legal principles and have a rational factual basis. *A decision is arbitrary or capricious when it is not supported by evidence or when there is no reasonable justification for the decision.*

Canty v. Bd. of Educ., 312 F.Supp. 254, 256 (S.D.N.Y.1970) (emphasis added and footnote omitted). *See also,* United States v. Carmack, 329 U.S. 230, 243–44 n. 14, 67 S.Ct. 252, 91 L.Ed. 209 (1946); [13] First National Bank of Fayetteville v. Smith, 365 F.Supp. 898, 902–03 (W.D.Ark.1973).[14] To paraphrase a standard invoked to judge allegedly arbitrary and capricious conduct in another context (public employment termination), the plaintiff must prove that the

---

13. In United States v. Carmack, 329 U.S. at 243–44 n. 14, 67 S.Ct. at 258, the Court stated:

"Arbitrary" is defined by Funk & Wagnalls New Standard Dictionary of the English Language (1944), as "1 . . .; without adequate determining principle; . . ." and by Webster's New International Dictionary, 2d Ed. (1945), as "2. Fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned; . . .."

"Capricious" is defined by Webster's New International Dictionary, 2d Ed. (1945), as "2. . . .; apt to change suddenly; freakish; whimsical; humorsome." (Citations omitted).

14. In the First National Bank of Fayetteville case, Judge Miller defined arbitrary and capricious in the following terms:

Capricious is defined as lacking a standard or norm, marked by variation or irregularity, lacking a predictable pattern, erratic or whimsical. Webster's Third New International Dictionary. Arbitrary is said to mean not rational or not done or acting according to reason or judgment. Black's Law Dictionary (Rev. 4th Ed.). The term taken together, "arbitrary and capricious," has been defined as an act done without adequate determining principle or not done according to reason or judgment.
365 F.Supp. at 902–903.

reasons stated by the Governor are either trivial, unrelated to the subject matter of the bill, or wholly unsupported by a basis in fact. *See,* Fisher v. Snyder, 476 F.2d 375, 377 (8 Cir. 1973) (and the cases there cited). It must be remembered, however, that in embarking upon the review which we now undertake, the Court must not pass upon the correctness or the justness of the Governor's decision; the substantive merits of Mr. Wilson's action. Rather, as we have said in another context, "the Court's role in a case such as this is to evaluate the written decision of the [Governor] in light of the relevant [facts] and to determine whether or not the decision has a basis in fact . . ." so as to assure ourself that Dominick Saffioti was not deprived of an opportunity to appear before the New York Court of Claims as the result of arbitrary and capricious conduct. Marquez v. Warden, 387 F.Supp. 565, 568 (S.D.N.Y.1974). *Cf.,* Towns v. Beame, 386 F.Supp. 470, 472 and 474 (S.D.N.Y.1974).

In response to a question of this Court, Mr. Saffioti stated that the Governor's veto of the involved bill was arbitrary and capricious solely because Mr. Wilson relied upon the fact that "I have been in other courts on other levels of our judiciary system." (Transcript of Hearing at 10). Elsewhere, Mr. Saffioti stated: "The only basis I'm to be before Your Honor is that he has used the basis of vetoing my bill as the Governor's memorandum stipulates, because I have been in the other courts." (Transcript of Hearing at 12–13).[15] Mr. Saffioti's argument that his bill was vetoed arbitrarily and capriciously fails for the exact reasons he states. In disapproving the bill, Governor Wilson simply and precisely enunciated the reasons for his action. *See* pp. 1338–1339, *supra.* Indeed, the Governor did, in fact, veto the bill because Mr. Saffioti had been accorded an ample opportunity to litigate the underlying factual issues before numerous courts and administrative tribunals. Having thus predicated his disapproval of the bill upon a non-trivial reason which finds a basis in fact, the Governor's action cannot be viewed as arbitrary and capricious. As we have earlier indicated, "[a] decision is arbitrary or capricious when it is not supported by evidence or when there is no reasonable justification for the decision." Canty v. Bd. of Educ., 312 F. Supp. at 256. Here, the Governor's veto is amply supported by evidence and is premised upon a reasonable justification, namely, that since Mr. Saffioti has had many opportunities to persuade numerous judges of the merits of his cause an additional opportunity to relitigate the dispute before the Court of Claims was not warranted. Far from being "an act done without adequate determining principle or not done according to reason or judgment," First National Bank of Fayetteville v. Smith, 365 F.Supp. at 903, the Governor's action is fully justified in the record. In sum, we conclude that

15. In addition to asserting that the Governor's reliance upon his prior litigious course was arbitrary and capricious, Mr. Saffioti presented the following analogy to the Court:

> Well, based on the Governor's memorandum it indicates that he vetoed my bill because I have litigated this matter in other courts.
> Now, the way I evaluate this basis is the same as I am not going to let you go over to The Court of Claims because you are an Italian and that's what I contend, and on those grounds, no, I would not accept that veto.

(Transcript of Hearing at 4.) This analogy, like the example of a racial motivated veto, *supra* p. 13, bears no relevance to the facts of this case. It must be remembered "that classifications based on alienage . . . nationality or race, are inherently suspect and subject to close judicial scrutiny" in the equal protection context. Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). Here, plaintiff alleges a deprivation of due process arising from arbitrary and capricious governmental conduct and the instant *facts* are not such as would trigger strict scrutiny.

in vetoing the private bill of Dominick Saffioti, Governor Wilson did not act arbitrarily and capriciously but instead acted reasonably upon the facts then in his possession.

## CONCLUSION

Accordingly, it is hereby ordered that the motion of the defendants to dismiss the complaint herein be and hereby is granted and that the Clerk of the Court enter judgment dismissing the complaint as to all defendants pursuant to Fed.R. Civ.P. 56(b).

It is so ordered.