George L. DOUGLAS, Bette Hatton, Richard Damron, Claude W. Jarrell, James E. Lucas, Carl Brunty, Martha L. Counts, Larry G. Porter, Donald L. Roy, Richard L. Webb, Hillard Browning, Paul Farris and Curley Belcher, Plaintiffs,

v.

Walter J. GALLOWAY, Robert G. Huffman, Charles Williams, Jerry Roach, James R. Campbell, Charles Shaver, Charles L. Miller and John D. Rockefeller, IV, all individually and in official capacities; and Lucien Frye, Wiley Stowers and Robert Nelson, all individually, Defendants.

William ENGLAND, John L. Cooper, Conrad Brown and Jessie Hypes, Plaintiffs,

v.

Julian W. WARE, individually and in his official capacity as District Engineer for District Ten (10) of the West Virginia Department of Highways; Christine Toney, individually and in her official capacity as Community Affairs Coordinator of District Ten (10) of the West Virginia Department of Highways; Charles L. Miller, individually and in his official capacity as Commissioner of the West Virginia Department of Highways; John D. Rockefeller, IV, individually and in his official capacity as Governor of the State of West Virginia; and other persons, individually and in their official capacities, whose names are at this time unknown to the plaintiffs, Defendants.

Civ. A. Nos. 82–2048, 82–2083.

United States District Court, S.D. West Virginia, Charleston Division.

July 25, 1983.

J. David Cecil, Leo Catsonis, Charleston, W.V., for plaintiffs.

Robert V. Berthold, Jr., Carl F. Stucky, Jr., Robert B. King, Richard L. Earles, Asst. Atty. Gen., Charleston, W.V., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the motion of defendant Governor John D. Rockefeller, IV, for summary judgment. The record before the court includes affidavits, depositions and answers to interrogatories, as well as the pleadings filed in these two actions.[1]

### I.

The plaintiffs in these two civil rights cases are former employees of the West Virginia Department of Highways (DOH), District Two and District Ten, in non-policy making positions. They were all hired prior to the November 4, 1980, general election in which defendant Rockefeller was reelected Governor of the State of West Virginia. In the first half of 1981, they, along with a number of other persons, lost their jobs with the DOH. The stated reason for this reduction in force was lack of funds due to fiscal and budgetary constraints. In their complaints, plaintiffs allege that the actual reason for their terminations was political and that the actions of the defendants resulted in a deprivation of their rights to freedom of association and belief guaranteed by the First and Fourteenth Amendments to the United States Constitution. They also assert that they had consistently received high evaluations from their supervisors in the DOH. The complaints seek injunctive relief, reinstatement with back pay and other employment benefits, and both compensatory and punitive damages.

With respect to Governor Rockefeller, plaintiffs allege that he, along with defendant Miller and others, expended or caused to be expended excessive funds from various line items of the DOH budget between the May 1980 primary election and the November 1980 general election, which expenditures were used to hire additional temporary or permanent employees and carry out various road projects with the intent of benefiting Rockefeller's reelection campaign. The plaintiffs further allege that after the November 1980 election, Governor Rockefeller, acting through his agents and/or conspiring with other defendants, utilized the then existing budget deficit as a pretext for removing registered Republicans and "out-faction" Democrats, including the plaintiffs, from employment with the DOH, to penalize plaintiffs for the exercise of their constitutional rights and to further the political organization of the "in-faction" Democrats. The complaint also alleges that the Governor, having the power and authority to prevent the deprivation of plaintiffs' constitutional rights and the knowledge in advance that plaintiffs' terminations would violate their rights, failed to act so as to prevent the wrongs alleged.

In his motion for summary judgment, Governor Rockefeller contends that he is entitled to judgment as a matter of law on the basis of official immunity, there being no material facts in dispute with respect to his immunity. Fed.R.Civ.P. 56(c). The Governor bases his immunity claim on two different doctrines: the qualified immunity accorded state executive officials in § 1983 cases, as enunciated in *Harlow v. Fitzger-*

---

1. These actions have not been consolidated but the grounds put forward by the Governor in his motions are identical and the parties have briefed them as a single motion. The court will treat them as consolidated for purposes of this order.

*ald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and the absolute immunity accorded elected representatives acting in their legislative capacities. *See Harlow,* 102 S.Ct. at 2732–33.

## II.

■ The court notes initially that the theory of qualified immunity invoked by the Governor applies to this litigation only insofar as the plaintiffs seek relief in the form of damages. It has "no application to a suit for declaratory or injunctive relief," *Rowley v. McMillan,* 502 F.2d 1326, 1331 (4th Cir.1974). *See Harlow v. Fitzgerald,* 102 S.Ct. at 2739, n. 34; *Ward v. Johnson,* 690 F.2d 1098, 1105 (4th Cir.1982). *Cf. Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 732–34, 100 S.Ct. 1967, 1974–1976, 64 L.Ed.2d 641 (1980) (absolute immunity accorded to state legislators extends to declaratory and injunctive relief).

■ The purpose of granting public officials a qualified or "good faith" immunity from liability for damages for constitutional violations is to protect the discretionary functions of those officials. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).[2] The Supreme Court, in evolving a test for qualified immunity, had regarded it as having both objective and subjective aspects. *See Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 999–1000, 43 L.Ed.2d 214 (1975). In *Harlow v. Fitzgerald, supra,* the Court recast its formulation for qualified immunity in order to eliminate time consuming and disruptive inquiries into the subjective motivation of government officials and bring insubstantial lawsuits to a quick termination. The Court noted that the objective element of the "good faith" defense "involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.'" *Harlow,* 102 S.Ct. at 2737, *quoting Wood v. Strickland,* 420 U.S. at 320, 95 S.Ct. at 999–1000. Focusing on this objective element, the Court announced the following substantive standard:

> We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow,* 102 S.Ct. at 2738 (citations omitted).

The *Harlow* opinion went on to state that:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he be fairly said to "know" that the law forbade conduct not previously identified as unlawful. . . . If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.
>
> . . . .
>
> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." *Pierson v. Ray,* 386 U.S. 547,

---

**2.** Qualified immunity is an affirmative defense, not an element of a prima facie case. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).

554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967).

*Harlow,* 102 S.Ct. at 2739 (footnotes omitted).

The right implicated in this litigation is the right of a public employee not to be discharged or threatened with discharge from employment on account of his partisan political affiliation or non-affiliation insofar as it cannot be demonstrated that party affiliation is an appropriate requirement for effective performance of the position involved. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Governor acknowledges the holdings of *Elrod* and *Branti,* but contends that it was not clear that "the principle of *Elrod* [had] any application to the facts at hand, which involve layoffs of state employees due to budgetary restraints." The premise of this argument is that *Elrod* and *Branti* both refer to discharges *solely* because of political affiliation. The Governor argues that neither *Elrod* and *Branti* nor subsequent case law clearly establish that an independent, legitimate justification for a termination decision coupled with an illegitimate one would violate First Amendment rights with respect to political affiliation.

This argument is flawed in two respects. First, it is plain that even if the DOH budget crisis were legitimate and reductions in force were thus necessary, the selection of particular employees for termination could not, under *Elrod* and *Branti,* be accomplished solely on patronage grounds. The fact that *Elrod* and *Branti* did not involve situations where a separate, non-political reason gave rise initially to the need to discharge employees does not render the rights of particular employees not to be terminated for political reasons any

less clearly established. The phrase "solely for political reasons" in those cases must be read in the context in which it appeared. As the Seventh Circuit noted in *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), "the issue of the motive for the firings [in *Elrod* ] was not disputed. There the defendant conceded that the employees were terminated because they were not Democrats." 653 F.2d at 1167. Rather, the question in *Elrod* was whether such politically motivated firings stated a First Amendment claim. The Supreme Court held that it did. The decision in *Elrod,* as elaborated in *Branti,* is the basis for plaintiffs' claim here. The Governor was aware of the decision in *Elrod,* as his affidavit shows.[3] Affidavit of John D. Rockefeller, IV, ¶ 2. *Branti* reiterates the language of *Elrod,* but the language " 'solely for the reason that they were not affiliated with or sponsored by the Democratic party' 427 U.S. at 350 [96 S.Ct. at 2678]" is quoted in support of the holding that "there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance." *Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1294.[4]

Second, the fact that *Elrod* and *Branti* did not articulate the manner in which a violation of the rights held to be protected by those cases could be proved does not, as the Governor suggests, indicate that the law with respect to those rights was not clearly established. In *Nekolny v. Painter, supra,* the court held that the district court properly allocated the burden of proof according to the formula enunciated in *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) for proving a viola-

3. According to the Governor's affidavit, the constitutional prohibition of *Elrod* was made a specific policy directive of his administration. *See Scott v. Plante,* 691 F.2d 634 (3rd Cir.1982).

4. Much of the confusion generated by the *Elrod* and *Branti* decisions, which the Governor alludes to in support of his assertion that the constitutional right posited by the plaintiffs

was not clearly established in 1981, involves the issue of whether tenure in a particular position may be conditioned on political affiliation. *See, e.g., Loughney v. Hickey,* 635 F.2d 1063, 1069 (3rd Cir.1980) (Aldisert, J., concurring). That issue is not presented in these cases.

tion of First Amendment rights. According to that formula, the plaintiff must first "show that his conduct was constitutionally protected [5] and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him." The burden then shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576. In support of its adoption of the *Mount Healthy* mixed motive instruction, the *Nekolny* court suggested that requiring a plaintiff to carry the burden of proof as to "sole motive" would "run the risk of not adequately protecting victims of First Amendment violations." 653 F.2d at 1168. However, it also pointed out that the net result equates with the language quoted from *Elrod*. "The *Mount Healthy* test allows a defendant to terminate an employee *for any legitimate reason,* even where, as in *Mount Healthy* itself, a reason violative of the First Amendment was also a substantial or motivating factor in the decision." *Id.* (emphasis added).[6]

Moreover, the plaintiffs have alleged that the budgetary constraints relied upon by the Governor were contrived in order to create a situation whereby the terminations of non-Rockefeller supporters could be effected. If this were the case, then the legitimate-illegitimate distinction would be irrelevant.

■ The plaintiffs have introduced evidence into the record on this motion for summary judgment showing that there are material issues of fact in dispute with respect to the legitimacy of the budget deficits as well as the part partisan politics played in the discharges and the Governor's role therein.[7] *Harlow, supra,* did not change the operation of Rule 56 in immunity cases. Under that summary judgment rule, the court must view the record in the light most favorable to the plaintiffs. *Poller v. CBS,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). *See Harlow,* 102 S.Ct. at 2737, n. 26. Here the "threshold immunity question" must be resolved against the Governor. Whether his conduct did in fact violate plaintiffs' rights in these cases is a separate question.[8]

5. The *Pickering* test which defendant cites as an alternative to the *Mount Healthy* formula is designed to ascertain whether certain conduct is protected under the First Amendment. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Cf. Wren v. Jones,* 635 F.2d 1277 (7th Cir.1980), *cert. denied,* 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 110 (1981) (articulating three possible tests for determining whether allegedly politically motivated discharges violate employees' First Amendment rights).

6. The *Mount Healthy* formula has been used in cases subsequent to *Elrod* in this circuit. *See Miller v. Board of Education of the County of Lincoln,* 450 F.Supp. 106 (S.D.W.Va.1978). *See also Daulton v. Affeldt,* 678 F.2d 487 (4th Cir. 1982). *Mount Healthy* has been almost universally followed by other circuits in political patronage cases, *e.g., Rosaly v. Ignacio,* 593 F.2d 145 (1st Cir.1979); *Tanner v. McCall,* 625 F.2d 1183 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Farkas v. Thornburgh,* 493 F.Supp. 1168 (E.D.Pa.1980), *aff'd mem.* 633 F.2d 209 (3rd Cir.1980), *aff'd mem. sub nom, Appeal of Farkas,* 642 F.2d 441 (3rd Cir.1981); as well as in other types of employee discharge cases. *E.g., NLRB v. Transportation Mgmt. Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

7. This material includes hiring and termination data for the DOH for 1980 to 1981 matched with employee voter registrations which show disproportionate Democratic hirings and Republican firings. Supplemental to Plaintiffs' Motion in Opposition to Defendant Rockefeller's Motion for Summary Judgment, Exhibits A, G, H. Other material supports the allegations that the budget deficits were contrived, thereby creating issues of fact for jury resolution. *Id.,* Exhibits C, I; Deposition of Kate Richardson Long (June 9, 1983), 92–99; Deposition of Kate Richardson Long (June 29, 1983), 54–66 (and exhibits referred to therein). Also filed is material evidencing notice to Governor Rockefeller of political discrimination in DOH employment practices and alleged inaction by Governor Rockefeller in the face of such notice. Plaintiffs' Motion in Opposition to Defendant Rockefeller's Motion for Summary Judgment, Exhibits 1, 2, 3, 4, 6; Supplemental to Plaintiffs' Motion, Exhibit C.

8. The Governor's position as chief executive officer of the state does not of itself insulate him from liability. As Justice Stevens has sug-

972

## III.

 The Governor's contention that he is clothed with absolute immunity with respect to his actions involving the state budget must likewise fall.

The Supreme Court has recognized an absolute immunity in cases brought under § 1983 for "actors 'in the sphere of legitimate legislative activity.'" *Lake Country Estates v. Tahoe Planning Agency,* 440 U.S. 391, 403, 99 S.Ct. 1171, 1178, 59 L.Ed.2d 401 (1979), *quoting Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). *See Supreme Court of Virginia v. Consumers Union,* 446 U.S. at 732, 100 S.Ct. at 1974. The Governor of West Virginia does have certain responsibilities with respect to the budget, Constitution of West Virginia, art. 6 § 51, including submission of a proposed budget to the legislature. The budget, however, is subject to legislative amendment and does not become final until the legislature acts on it. *Id.*[9] The Governor's functions respecting the budget are essentially executive; he proposes, the legislature disposes. Such gubernatorial activity by no means encompasses "the State's entire legislative power with respect to the" budget, as was true of the actions of the Supreme Court of Virginia in the case relied on by the Governor. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. at 734, 100 S.Ct. at 1975. Nor can the Governor's activities with respect to the budget as outlined in his affidavit and other materials of record be characterized as legislative acts. *See id. Cf. Saffioti v. Wilson,* 392 F.Supp. 1335, 1343 n. 10 (S.D.N.Y.1975) (dictum to effect that veto of private bill may be legislative act). As the Supreme Court stated in *Harlow,* "for executive officials in general . . . our cases make plain that qualified immunity represents the norm." 102 S.Ct. at 2733.

gested, "Other officials, whose exercise of discretion is given greater deference by the courts, see *Scheuer v. Rhodes, supra,* may have a correspondingly greater duty to consider the legal implications of their conduct." *Procunier v. Navarette,* 434 U.S. 555, 571, 98 S.Ct. 855, 864, 55 L.Ed.2d 24 (1978).

## IV.

For the reasons stated, it is ORDERED that the motion of defendant Rockefeller for summary judgment in these actions be, and it hereby is, denied.

9. The possibility of a gubernatorial veto does not negate this legislative/executive distinction. The Governor's veto is qualified, not absolute; it can be overridden and the budget bill can become law without his signature. W.Va. Const. art. 6, § 51; *Jones v. Rockefeller,* 303 S.E.2d 668 (W.Va.1983).